493 S.E.2d 826

CRESTWOOD GOLF CLUB, INC., Crestwood Partnership, John Boyd, Claude McCain, Walter Bryant and George McCain, Respondents,

v.

Harry H. POTTER, Marguerite Potter and Kevin E. Potter, Appellants.

CRESTWOOD GOLF CLUB, INC., Crestwood Partnership, John Boyd, Claude McCain, Walter Bryant and George McCain, Respondents.

v.

Theodore POTTER, Dale Potter, South Carolina National Bank, the Crestwood County Club, Inc. and Kevin E. Potter,

Of which Theodore, Dale and Kevin Potter are Appellants.

No. 24713.

Supreme Court of South Carolina.

Heard June 17, 1997.

Decided Nov. 10, 1997.

Rehearing Denied Dec. 30, 1997.

204

Kevin, Theodore, Harry, Dale and Marguerite Potter, Millville, N.J., Pro Se Appellants.

James Mosteller, III, Blackville; and James Nance, of Henderson & Salley, Aiken, for Respondents.

TOAL, Justice:

This dispute stems from the sale of a golf course. The appellants raise numerous issues on appeal. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

The facts in this case are somewhat complicated. A summary of relevant facts, parties, and transactions follows:

### A. UNDERLYING TRANSACTION (SALE OF CRESTWOOD GOLF COURSE)

On April 3, 1991, Theodore and Dale Potter ("Purchasers") entered into an agreement with Crestwood Partnership ("Partnership") and Crestwood Golf Club, Inc. ("Golf Club") (collectively "Sellers") to purchase certain real property and improvements ("Golf Course") in Bamberg County, as well as machinery, equipment, membership lists, and golf carts. A golf course and country club (restaurant and bar) were located on the property. According to the sales agreement, the total sales price for Golf Course was $412,315.22.[1]

An addendum to the sales agreement stated that of the purchase price, $60,000 represented the price for the land itself, and $250,000 represented the price for buildings and improvements. The sales agreement itself did not state the price for the personalty at issue, which included, among other things, equipment, membership lists, and golf carts. However, the bill of sale for the personalty stated the purchase price was $102,305.22. The total of these figures is $412,305.22, ten dollars less than the total purchase price. However, the sales agreement separately valued the membership lists at ten dollars, and we assume that accounts for the discrepancy in the figures and the purchase price.

---

1. According to the closing statement, the final sales price was $417,-516.48, which consisted of the contract price plus various closing costs.

At closing, Purchasers paid Sellers $125,201.26, leaving a balance of $292,315.22. Purchasers obtained financing and other credits for the rest of the amount. The various sources of the financing will be discussed below.

Although the sales agreement was between Purchasers, Partnership, and Golf Club, subsequent instruments clarify what portion of the property Partnership had owned and what portion Golf Club had owned. The deed of the real property and improvements was executed on April 3, 1991. Specifically, Partnership alone deeded the real property and improvements to Purchasers. Golf Club apparently never owned any portion of the real property and improvements. In contrast, the Bill of Sale for the personalty, including equipment and golf carts, reflected that Purchasers bought the personalty from Golf Club alone; Partnership did not own the personalty that was the subject of the transaction.

## B. FINANCING OF SALE OF GOLF COURSE

### 1. Notes and Mortgages

Purchasers financed the transaction through a variety of means. First, they borrowed $205,836.25 from South Carolina National ("Bank").[2] This debt was secured by Purchasers' mortgage ("Bank Mortgage") of Golf Course, as well as a security interest in assets owned by Purchasers in connection with Golf Course. Sellers executed to Bank a continuing guaranty of Purchasers' debt to Bank.

Purchasers also borrowed $72,135.76 ("Crestwood Note") from Sellers in order to finance the purchase of Golf Course.

---

**2.** Partnership and its partners individually had owed Bank approximately this amount. The sales agreement as originally drafted required Purchasers to assume certain Partnership and individual partners' obligations to Bank. Purchasers would have assumed four individual promissory notes to Bank. The amount owed on each of those notes was $27,161.25. Purchasers would also have had to assume a debt of Partnership to Bank in the amount of $98,657.27. These five obligations totalled $207,302.27, only slightly more than the $205,836.25 note Purchasers executed to Bank.

Ultimately, however, instead of assuming the five debts, Purchasers simply executed a promissory note to Bank in the total amount owed by Partnership and the individual partners. Partnership and the partners then guaranteed Purchasers' obligation to Bank.

This debt was secured by Purchasers' mortgage ("Crestwood Mortgage") of Golf Course to Sellers. In addition to securing the $72,135.76 debt to Sellers, the Crestwood Mortgage secured, among other things, "all contingent liability which the Mortgagor [Purchasers] has to the Mortgagee [Sellers] pursuant to indebtedness of [Purchasers] to the South Carolina National Bank which is guaranteed by certain of [Sellers] pursuant to Agreement for Purchase and Sale of Assets by [Purchasers] ... for a total principal sum not to exceed $290,534.29 [3] ... plus interest at the same rate as in the Note and any other costs payable hereunder...." Purchasers also gave Sellers a security interest in assets owned by Purchasers in connection with Golf Course.

## 2. Guarantees

As a condition of the sale of Golf Course, Sellers and Bank required Theodore Potter's [4] parents ("Guarantors") to guarantee all Purchasers' indebtedness to Bank and to Sellers. Therefore, Guarantors executed two separate guarantees. First, they guaranteed Purchasers' indebtedness to Bank ("Bank Guaranty"). They also guaranteed Purchasers' indebtedness to Sellers ("Crestwood Guaranty"), including the $290,-534.29 contingent liability referenced in the Crestwood Mortgage.

## 3. Assignment of Financial Documents

As holders of the Crestwood Note and mortgagees of the Crestwood Mortgage, Sellers assigned to Bank their interest in the Crestwood Note, Crestwood Mortgage, Crestwood Guaranty, and various leases (assignment hereinafter referred to as "Collateral Assignment"). The Collateral Assignment

---

**3.** This figure represented the total of the $72,135.76 Note, the $205,-836.25 Note to Bank, and a $12,562.28 obligation of Golf Club to Sellers that Purchasers had assumed. Because Partnership, Golf Club, and certain individuals had guaranteed the Bank Note, they wanted Purchasers to provide security for the entire amount for which Partnership could be liable as a guarantor.

**4.** As noted above, Theodore Potter was one of the purchasers of Golf Course. He and his wife Dale Potter (when referred to individually, "Wife") both signed the sales agreement and all promissory notes, mortgages, and security agreements.

document gave Sellers the "right to receive and use and enjoy the property which is the subject" of the assignment, as long as Sellers did not default under the terms of the Collateral Assignment. Paragraph 4(a) of the Collateral Assignment required Sellers to:

(i) give prompt notice to the Lender [Bank] of any default under the Assigned Documents which is not timely cured as provided therein; (ii) at the sole cost and expense of the Assignor [Sellers], enforce the payment and observance of each and every covenant and condition of the Assigned Documents, and (iii) appear in and defend any action growing out of or in any manner connected with, the Assigned Documents.

## C. LAWSUITS RELATING TO SALE OF GOLF COURSE

By June 1, 1992, Purchasers ceased making payments on the Bank Note. They informed Bank "that they did not intend to pay the bill, and for [Bank] to go to [Sellers] for payment." As guarantors of Purchasers' debt to Bank, Sellers began making payments to Bank in order to avoid defaulting on their continuing guaranty.

Purchasers made interest payments on the Crestwood Note from approximately April 3, 1991 until November 3, 1991. Purchasers then ceased making any payments. Sellers demanded Guarantors fulfill the terms of the Crestwood Guaranty by satisfying the amount of Purchasers' indebtedness, but Guarantors failed to do so. It is clear from the Record that Purchasers were dissatisfied with the condition of Golf Course and felt that Sellers committed material misrepresentations in the process of selling Golf Course to Purchasers.

Several lawsuits stemmed from this dispute between Purchasers and Sellers, but only three are particularly relevant to this appeal.

### 1. Foreclosure Action against Purchasers

On May 29, 1992, Sellers filed a complaint against Purchasers. The complaint primarily sought foreclosure of the Crestwood Mortgage and security agreement. Purchasers' answer was filed June 26, 1992. It contained several defenses and

counterclaims, including counterclaims for fraud, breach of contract, and racketeering.

Because of the outcome of a federal lawsuit involving identical claims, the trial court dismissed Purchasers' counterclaims and referred the foreclosure portion of the action to a master in equity. The master in equity found Sellers entitled to foreclose except as to Theodore Potter's half interest in the real estate and improvements.[5]

Purchasers appeal the trial court's order dismissing the counterclaims and the master's order requiring foreclosure.

## 2. Lawsuit against Guarantors

On May 26, 1992, Sellers filed a complaint against Guarantors. The complaint alleged that Purchasers had defaulted under the terms of the Crestwood Note and Crestwood Mortgage and that Sellers had accelerated the amount due because of such default. The complaint also alleged that Guarantors were liable for the full amount of Purchasers' indebtedness to Sellers by reason of Guarantors' unconditional guaranty of Purchasers' obligations to Sellers.

Guarantors answered the complaint on June 26, 1992. The answer contained several defenses and counterclaims.[6] Specifically, Guarantors alleged Sellers had engaged in fraud, breach of contract, and racketeering.

The trial court dismissed Guarantors' counterclaims and referred the cause of action concerning the Crestwood Guaranty to the master in equity. The master in equity ruled Sellers had a right to recover under the terms of the Crestwood Guaranty. Guarantors appeal the dismissal of the counterclaim and the ultimate ruling of the master in equity.

---

5. In federal court, Theodore Potter received the remedy of rescission of the deed for the real estate and improvements, but not for the bill of sale for the personalty. Stated another way, Theodore obtained a judgment against Partnership, which had sold him the real estate, but not against Golf Club, which had sold him the personalty. Because he continued to have an interest in the personalty covered in the security agreement, Theodore Potter remained a party to this action.

6. They later filed an amended answer alleging additional defenses.

### 3. Federal Court Litigation

Theodore Potter, Kevin Potter,[7] and Guarantors brought an action against Sellers in the summer of 1993 in the United States District Court for the District of South Carolina. Dale Potter, Theodore Potter's wife, was not a party to the federal action. This lawsuit concerned the agreement to sell Golf Course and all its equipment and improvements. The Potters alleged fraud, breach of contract, and certain other causes of action.

The district court judge dismissed the fraud claims and directed a verdict in favor of Sellers as to Guarantors' claims. Theodore and Kevin Potter's claims regarding negligent misrepresentation were sent to the jury, and the jury found negligent misrepresentation in the sale of the real estate and improvements. Accordingly, the Potters obtained judgment against Partnership, which had sold them the real property. Theodore and Kevin Potter elected the remedy of rescission of the contract as to the real estate and improvements rather than simply collecting damages for breach of contract. As to personalty, the judgment was in favor of Golf Club, which had sold Purchasers the personalty; accordingly, Theodore Potter or his assignee remained responsible for his agreement to purchase equipment and other personalty from Sellers.

### LAW/ANALYSIS

Purchasers and Guarantors have raised a number of issues on appeal. We shall first address the Dale Potter appeal, then the Theodore and Kevin Potter appeal, then the appeal by Guarantors.

### A. DALE POTTER APPEAL

#### 1. DISMISSAL OF COUNTERCLAIM

Kevin Potter, who allegedly is appearing as assignee of Dale Potter's interests, raises several issues concerning the dismiss-

---

7. Kevin Potter is the brother of Theodore Potter. Although the nature of his relationship to these lawsuits is not entirely clear, Kevin appears to have been the assignee of Theodore Potter's interests. He further asserts he is the assignee of Dale Potter's interests.

al of Dale Potter's counterclaims.[8] Because Dale Potter did not appeal the rulings of the trial court, the issues raised by Kevin Potter concerning Dale Potter are not properly before this Court. Accordingly, we affirm the dismissal of Dale Potter's counterclaims.

The basis for the trial court's dismissal of Dale Potter's counterclaims is unclear. Portions of the order dismissing the counterclaims suggest the dismissal resulted from Dale Potter's failure to appear and defend in the lawsuit. Other portions of the order suggest her counterclaims were dismissed based on res judicata and collateral estoppel. In either case, there is no reversible error.

■ If the trial court dismissed Dale Potter's counterclaims based on her repeated failure during the litigation to appear and to prosecute and defend the action, there was no error. Rule 41(c), SCRCP, allows a trial judge to dismiss an action, upon a party's motion, for the other party's failure to prosecute a counterclaim, cross-claim, or third-party claim. Here, that rule would not apply; any dismissal was accomplished by the judge *sua sponte*. However, this Court has held that trial judges possess the inherent power to dismiss actions *sua sponte* for a party's failure to prosecute the relevant claims. *See, e.g., Small v. Mungo*, 254 S.C. 438, 442, 175 S.E.2d 802, 803 (1970) (noting that "it is within the inherent power of the court to dismiss an action for failure to prosecute."); *see also* 24 Am.Jur.2d *Dismissal, Discontinuance, and Nonsuit* 48 (1983) ("Provision is made in federal and state statutes or rules of practice for dismissal of civil actions for failure of

---

8. Purchasers argue in part that Dale Potter's counterclaims were never actually dismissed by the trial court. Their argument concerning the dismissal of the counterclaims is a "fallback" position. Based on the language in the order dismissing the counterclaims, as well as statements made by the trial judge at the hearing on the motion to dismiss the counterclaims, we conclude Dale Potter's counterclaims were dismissed at the same time that Theodore Potter's counterclaims were dismissed.

When he dismissed the counterclaims, the trial judge referred all remaining issues to the master in equity. If he had not intended to dismiss Dale Potter's counterclaims, then they were referred to the master in equity, and Dale Potter should have appealed the order of reference. Given that neither she nor anyone else appealed that order, we conclude the parties agreed that Dale Potter's counterclaims had been dismissed by the trial court's order.

prosecution by the plaintiff. However, the power of trial courts to dismiss a case for failure to prosecute with due diligence is generally considered inherent and independent of any statute or rule of court. Such power is deemed to be necessarily vested in trial courts to manage their own affairs so as to achieve orderly and expeditious disposition of cases."); *cf. Collins v. Sigmon,* 299 S.C. 464, 385 S.E.2d 835 (1989) (finding that federal court's exercise of inherent power to dismiss a case *sua sponte* for lack of prosecution operated as an adjudication on the merits just as would a dismissal pursuant to Rule 41, FRCP.). Nevertheless, as will be explained below, there is no reversible error even if the judge should not have dismissed Dale Potter's counterclaims for failure to prosecute.

■ If the trial court dismissed Dale Potter's counterclaims based on the doctrines of res judicata or collateral estoppel, the dismissal was error. For a claim to be barred by the doctrine of res judicata, identity of parties is necessary. No one disputes that Dale Potter was not a party to the federal court action. Accordingly, res judicata cannot apply to her counterclaims in the state court foreclosure action.

Nevertheless, such error is not reversible because Dale Potter has not appealed the dismissal of her counterclaims. The Potters claim Kevin Potter has appealed as assignee of Dale Potter. However, the Record contains insufficient evidence of any such assignment. The transcript of the hearing before the master in equity references an inadequate deed from Dale to Theodore Potter; the deed lacks a sufficient number of witnesses and also is not recorded. Additionally, although the Record contains an assignment of Dale Potter's interest, it does not appear this assignment was presented either to the trial court that dismissed the counterclaims or to the master in equity who ordered the foreclosure. Given the lack of evidence regarding an assignment, Dale Potter herself was required to appeal the dismissal of her counterclaims. Because she failed to do so, the dismissal of her counterclaims is affirmed in its entirety.

### 2. FORECLOSURE ORDER AGAINST DALE POTTER

Even assuming Kevin or Theodore Potter received an assignment of Dale Potter's interest in time for them to appeal

the foreclosure order, we affirm the order of foreclosure against Dale Potter's half interest in Golf Course and the improvements and personalty located thereon. The legal issues raised regarding foreclosure against Dale Potter mirror those raised by Theodore and Kevin Potter, which are discussed below.

## B. THEODORE AND KEVIN POTTER APPEAL

### 1. STANDING

Purchasers first argue the master in equity erred in finding Sellers entitled to enforce the Crestwood Guaranty and Crestwood Mortgage. They specifically claim Sellers lack standing to enforce these instruments because Sellers assigned all rights in the instruments to Bank. We disagree.

Ordinarily, an assignment "vests the legal title in the assignee and places the property beyond the control of the assignor...." 6 Am.Jur.2d *Assignments for Benefit of Creditors* 75 (1963). When the assignor retains no rights to the assigned property, the assignor lacks standing to enforce any agreements regarding the assigned property.

Unlike a traditional assignment, however, the Collateral Assignment makes clear that Sellers retained both the right and the obligation to enforce the assigned documents. Although the Collateral Assignment does contain language assigning to Bank "all of the right, title and interest of [Sellers] to" the Crestwood Note, Crestwood Mortgage, Crestwood Guaranty, and certain leases, later language clarifies the nature of the assignment. Paragraph 2(a) of the Collateral Assignment gives Sellers the right "to receive and use and enjoy the property which is the subject of this Assignment" as long as Sellers do not default on any guaranty obligations to Bank and comply with the terms of the Collateral Assignment. Paragraph 2(b) provides that the Collateral Assignment shall "become and be void and of no effect" after Sellers satisfy all indebtedness the Collateral Assignment is intended to secure. This language and other language in the Collateral Assignment indicates the sole purpose of the assignment is to provide additional security for Sellers' guaranty of Purchasers' debt to Bank.

Paragraph 4 of the Collateral Assignment directly addresses Sellers' right to enforce the assigned documents. As quoted above, paragraph 4(a) requires Sellers to bring actions to enforce the assigned documents:

> The Assignor will: (i) give prompt notice to the Lender of any default under the Assigned Documents which is not timely cured as provided therein; (ii) *at the sole cost and expense of the Assignor, enforce the performance and observance of each and every covenant and condition of the Assigned Documents,* and (iii) *appear in and defend any action growing out of or in any manner connected with, the Assigned Documents.*

(emphasis added). As provided by paragraph 4(c), Bank will enforce the assigned documents only if Sellers default on their guaranty obligation to Bank or fail to comply with the conditions of the Collateral Assignment.

Therefore, Sellers had both the right and the duty to bring actions to foreclose the Crestwood Mortgage. Given the language of the Collateral Assignment, Appellants' argument regarding standing or real party in interest lacks merit.

## 2. CLAIM SPLITTING

Purchasers next argue that the trial court and/or master in equity erred in allowing the Crestwood foreclosure action and the action on the Crestwood Guaranty to be tried as separate lawsuits. In essence, they suggest the Crestwood Mortgage and Crestwood Guaranty arose from the same transaction and that, therefore, Sellers were obliged to try the foreclosure and guaranty as one action.

Purchasers' argument fails for three reasons. First, none of the relevant orders address this issue, so even if the issue was raised,[9] Purchasers had a duty to move pursuant to Rule 59(e), SCRCP, for a ruling on the issue. Second, Sellers moved to consolidate the cases, but Purchasers opposed con-

---

9. At the April 24, 1995 hearing, for the first time, Kevin Potter stated it would be best if the foreclosure and guaranty actions were tried together. Sellers had no objection to this, and it appears from the Record that the parties actually consented to the procedure that ultimately was followed. Given those facts, it is unclear exactly what Purchasers are appealing here.

solidation. Third, the hearing in the foreclosure and guaranty actions was, in fact, consolidated, even though technically the cases themselves were not. Under these circumstances, this issue lacks merit.

### 3. ADJUDICATION OF EQUITABLE CLAIMS PRIOR TO FINAL DECISION ON COUNTERCLAIMS

Purchasers next argue the master in equity erred in failing to stay the equitable proceedings until the appeal of the dismissal of the legal counterclaims. We need not reach this issue.

Given our affirmance of the dismissal of Theodore Potter's counterclaims, Theodore and Kevin Potter have suffered no harm from the trial of the foreclosure action prior to the final appellate disposition of the counterclaims.

### 4. THEODORE'S COUNTERCLAIMS—EFFECT OF STIPULATION

Theodore Potter next argues that the trial court erred in dismissing his counterclaims because Sellers had consented through stipulation of counsel to litigating certain of the counterclaims after the federal trial. We disagree.

The Record contains no such stipulation, and we are aware of none. As the appellant, Theodore Potter bore the burden of providing this Court with a sufficient Record to review his assertions of error. *See, e.g., Hamilton v. Greyhound Lines East,* 281 S.C. 442, 316 S.E.2d 368 (1984); *see also* Rule 209(h), SCACR ("Except as provided by Rule 211 and Rule 207(b)(1)(D) and (2), the appellate court will not consider any fact which does not appear in the Record on Appeal.").

Moreover, as Sellers note, at the state court hearing on Sellers' motion to dismiss the counterclaims, Potter did not argue or introduce the stipulation to which he now refers. In short, this issue was not raised to the trial court. Accordingly, this Court need not address the issue. *See, e.g., Schofield v. Richland County School Dist.,* 316 S.C. 78, 447 S.E.2d 189 (1994) (an issue may not be raised for the first time on appeal, but must have been raised to the trial judge to be preserved for appellate review).

### 5. LACK OF CONSENT TO LITIGATE MORTGAGE ISSUES AFTER FEDERAL TRIAL

Purchasers next argue that if the parties did not consent to litigating the validity of the Crestwood mortgages after the federal trial, then the doctrines of res judicata and collateral estoppel bar any action on the foreclosure because the validity of the mortgage could and should have been litigated as part of the federal action. We disagree.

The precise issue here is whether Sellers should have been barred from asserting their claims in state court since they could and should have asserted such claims as counterclaims in federal court.

In resolving whether res judicata applies, the discussion must be divided between permissive and compulsory counterclaims. However, even before reaching these subjects, it must first be decided if federal or state law controls. In the instant case, the prior litigation occurred in federal court. In *Kirven v. Virginia–Carolina Chemical Co.*, 77 S.C. 493, 498, 58 S.E. 424, 425 (1907), the South Carolina Supreme Court held that "When the [federal] judgment was urged as a bar to the action in the State Court, a Federal question was presented, and must be determined in accordance with the decisions of the United States Supreme Court." Thus, federal law controls in this case.

The term res judicata encompasses two types of preclusion: claim preclusion and issue preclusion. *See Pedrina v. Chun,* 906 F.Supp. 1377 (D.Hawai'i 1995). "Issue preclusion and claim preclusion have historically been called collateral estoppel and bar or merger respectively." *Id.* at 1399. For the sake of simplicity, this Court will use the terms issue preclusion and claim preclusion. "Issue preclusion only bars relitigation of particular issues actually litigated and decided in the prior suit." *Id.* "Claim preclusion ... bars plaintiffs from pursuing successive suits where the claim was litigated or could have been litigated." *Id.* Issue preclusion is inapplicable to the instant case because Purchasers are arguing that Sellers should have litigated issues in federal court, not that such issues were actually litigated.

The application of claim preclusion turns on whether a counterclaim is permissive or compulsory. If a counterclaim is permissive, but not raised in the first case, a defendant is not precluded from asserting the claim in a later action. *See Kirven v. Virginia–Carolina Chemical Co.*, 77 S.C. 493, 58 S.E. 424 (1907), *aff'd*, 215 U.S. 252, 30 S.Ct. 78, 54 L.Ed. 179 (1909); 50 C.J.S. *Judgments* 777(c) (1997). On the other hand, if a counterclaim is compulsory, but not raised in the first action, a defendant is precluded from asserting the claim in a subsequent action. *See Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 469 n. 1, 94 S.Ct. 2504, 2506 n. 1, 41 L.Ed.2d 243, 247 n. 1 (1974); *Dillard v. Security Pacific Brokers, Inc.*, 835 F.2d 607, 609 (5th Cir.1988); *In re Phillips*, 124 B.R. 712, 716 (Bkrtcy.W.D.Tex.1991).

Therefore, in the instant case, the pivotal issue is whether Sellers' potential counterclaims in the federal case were compulsory or permissive. Rule 13(a), FRCP, states, "A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim...." However, there is a significant exception to this rule: "the pleader need not state the claim if (1) at the time the action was commenced the claim was the subject of another pending action...." Rule 13(a), FRCP. In this case, Sellers filed their action against Harry and Marguerite Potter in state circuit court on May 26, 1992. Three days later, Sellers filed their action against Theodore and Dale Potter in state circuit court. It was not until the summer of 1993 that Theodore, Harry, and Marguerite Potter filed their action in federal district court. Clearly, the state court actions were pending at the time the federal action was commenced. Therefore, Sellers' potential counterclaims in the federal case were not compulsory because such claims were the subject of pending litigation in state court. Consequently, claim preclusion is not a bar to Sellers' claims in state court.

### 6. CONSENT TO LITIGATING MORTGAGE AND GUARANTY IN SEPARATE ACTION

Purchasers next argue that because Sellers consented to litigating all issues concerning the Crestwood Mortgages in a

separate action,[10] dismissal of the counterclaims was inappropriate under Rule 12(b)(8), SCRCP. This argument is simply a restatement of Potters' other arguments concerning dismissal of the counterclaims, and we find it lacks merit.

### 7. SELLERS' MOTION TO AMEND PLEADINGS

Purchasers next argue the trial court erred in allowing Sellers to amend their pleadings to allege res judicata and collateral estoppel as defenses to Purchasers' counterclaims. We disagree.

At the hearing on Sellers' motion to amend their pleadings to allege these defenses and on Sellers' motion to dismiss the counterclaims, Purchasers simply addressed the substance of the res judicata and collateral estoppel issues without arguing that Sellers should not be allowed to amend their pleadings to include res judicata and collateral estoppel. Given this fact, we hold Purchasers impliedly waived any objection they had to amendment of the pleadings, and that, therefore, such amendment was appropriate under Rule 15, SCRCP. Moreover, Rule 15 provides that "leave [to amend pleadings] shall be freely given when justice so requires and does not prejudice any other party." We find no abuse of discretion here. *See, e.g., Foggie v. CSX Transportation, Inc.,* 313 S.C. 98, 431 S.E.2d 587 (decision on motion to amend pleadings rests within sound discretion of trial judge).

### 8. DISCOVERY ABUSE

Purchasers next argue the trial court erred in refusing to grant their motion for discovery relief because of Sellers' failure to answer any discovery. We disagree.

In the motion for sanctions, Purchasers asked for the following relief: (1) dismissal of Sellers' complaints and judgment in favor of the Purchasers on the Purchasers' counterclaims; or (2) striking of Sellers' answers to counterclaims and refusing to allow Sellers to "support or oppose designated claims and defenses"; or (3) continuance of trial until Sellers fully complied with Purchasers' discovery requests. Attached to the motion are interrogatories, requests for production of documents, and requests for admission. The motion also

---

10. Purchasers refer to various "stipulations" that are nowhere to be found in the Record.

describes alleged discovery abuse occurring during certain depositions noticed by Purchasers.

The master in equity heard arguments and testimony on this motion.[11] Appellant Kevin Potter requested the judge deem admitted all the Purchasers' requests for admission because of Sellers' failure to respond. One of Sellers' attorneys stated to the Court that he had never received the requests for admission.[12] Bank's attorney stated to the Court that he had no memory of the delivery and service of the requests for admission. One of Sellers' attorneys also denied having received a letter from Kevin Potter questioning him about the status of the requests. Ultimately, the master in equity allowed Sellers to respond to the requests for admission, and Sellers admitted four of the requests and denied the rest. The master in equity did not abuse his discretion by refusing to deem admitted the requests for admission, particularly in light of the lack of hard proof that Sellers actually received the requests.

As to the interrogatories and document requests, one of Sellers' lawyers stated to the master in equity that he answered Purchasers' interrogatories and request for production of documents. The lawyer apparently then introduced the certificate of mailing for the answers to the interrogatories and request for production of documents, which certificate has been included in the Record on Appeal. We find that the master in equity had sufficient evidence before him to conclude that sanctions were inappropriate.[13] Kevin Potter seems to complain that he never received the discovery, but the certificate of service suggests Sellers did all that they were obligated to do. Moreover, as Sellers point out, although Sellers in the discovery answers objected to certain information, Purchasers never moved to compel more complete an-

---

11. The trial judge determined that all pending motions, including discovery motions, would be referred to the master in equity as part of the foreclosure and guaranty actions.

12. Kevin Potter asserted that he hand-served the requests for admission at the deposition of Marguerite Potter, a guarantor.

13. One of Sellers' lawyers stated at the hearing on the motion for discovery sanctions that the answers to interrogatories and document requests were the same in the foreclosure action and in the action on the guaranty.

swers or more documents; rather, Purchasers simply denied having received any discovery.

Under these circumstances, the master in equity did not err in refusing to sanction Sellers. *See, e.g.,* Rule 37, SCRCP (generally providing for motion to compel discovery prior to any imposition of sanctions); *Dunn v. Dunn,* 298 S.C. 499, 502, 381 S.E.2d 734, 735 (1989) (stating that the "trial court judge's ruling on discovery matters will not be reversed on appeal absent a clear abuse of discretion.").

### 9. ATTORNEYS' FEES

Finally, Purchasers argue the attorneys' fee award by the master in equity was excessive and included costs associated with other actions. We disagree.

The master in equity made thorough findings regarding the factors to consider in determining a reasonable attorneys' fee. *See, e.g., Blumberg v. Nealco, Inc.,* 310 S.C. 492, 427 S.E.2d 659 (1993) (delineating factors to consider in attorneys' fee award and requiring judges to state findings explicitly). Moreover, considerable evidence was presented at the hearing regarding the time spent by the attorneys in attempting to represent their clients' interests. The affidavit filed after the hearing had as its purpose the segregation of attorneys' fees associated with the foreclosure from fees associated with related proceedings. When the master in equity stated he would require a post-hearing affidavit segregating attorneys' fees associated with the foreclosure from those associated with other related actions, Purchasers did not object. We find ample support for the attorneys' fee award.

### C. HARRY AND MARGUERITE POTTER APPEAL

Guarantors have raised a number of issues on appeal. Nearly all the issues are identical to those raised by Purchasers. Based on our rulings in Purchasers' appeal, we affirm the following issues raised by Guarantors: Issue 1 (standing/capacity to sue); Issue 2 (failure to join necessary parties); Issue 3 (adjudication of equitable claims prior to final decision on counterclaims); Issue 4 (dismissal of Guarantors' counterclaims); Issue 5 (res judicata/collateral estoppel as to Sellers' claims); Issue 6 (consent to litigating mortgage and guaranty in separate action); Issue 7 (motion to amend answer to

counterclaims); Issue 8 (discovery abuse; importantly, the Record does not reflect that Guarantors moved to compel discovery); Issue 10 (attorneys' fees).

Guarantors' Issue 9 is different from any issue raised by Purchasers. Specifically, Guarantors argue the master erred by entering judgment against them prior to assessment of Purchasers' default. They further argue the judgment against them should not have exceeded the amount of Purchasers' default.[14]

██ We find no error. There are several good reasons the judgment against Guarantors exceeded the amount of Purchasers' default. First, Sellers incurred greater attorneys' fees in the action against Guarantors. Second, and more importantly, Guarantors guaranteed to Sellers Purchasers' payment of $290,534.29. Purchasers did not actually owe Sellers that full amount; part of that amount represented an obligation of Purchasers to *Bank*. However, because Sellers had guaranteed Purchasers' obligation to Bank, Sellers obtained from Guarantors an obligation to "cover" this amount should Purchasers default in their obligation to Bank. In contrast, Sellers could only obtain judgment against Purchasers in the amount of Purchasers' default to Sellers plus any amount Sellers had actually paid on their guaranty of Purchasers' debt to Bank. The difference in the amounts of the judgments was well supported by the evidence and by the differing nature of the Guarantors' and Purchasers' obligations to Sellers.

Moreover, we find no prejudice in the entry of judgment prior to assessment of Purchasers' default. The amount of the judgment entered against Guarantors finds full support in the Record.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court and of the master in equity are AFFIRMED.

FINNEY, C.J., MOORE and WALLER, JJ., and L. CASEY MANNING, Acting Associate Justice, concur.

---

14. Judgment against Purchasers totalled $218,653.93, whereas the judgment against Guarantors totalled $437,555.