756 S.E.2d 900

CATAWBA INDIAN NATION, a/k/a The Catawba Indian Nation of South Carolina, a/k/a The Catawba Indian Tribe of South Carolina, Appellant,

v.

STATE of SOUTH CAROLINA and Mark Keel, in his official capacity as Chief of the South Carolina Law Enforcement Division, Respondents.

Appellate Case No. 2012–212118.
No. 27374.

Supreme Court of South Carolina.

Heard Jan. 22, 2014.
Decided April 2, 2014.

528

William W. Wilkins, of Nexsen Pruet, of Greenville; Gregory Poole Harris, of Harris & Gasser, LLC, of Columbia; James Walter Fayssoux, Jr. and Paul S. Landis, both of Fayssoux Law Firm, of Greenville, for Appellant.

Attorney General Alan McCrory Wilson, Assistant Deputy Attorney General Clyde H. Jones, Jr., and Solicitor General Robert D. Cook, all of Columbia, for Respondents.

Justice BEATTY.

The Catawba Indian Nation (the "Tribe") brought this declaratory judgment action against the State of South Carolina and Mark Keel (collectively, the "State") to determine the effect of the Gambling Cruise Act, S.C.Code Ann. §§ 3–11–100 to –500 (Supp.2013), on its gambling rights. The circuit court granted summary judgment to the State, finding: (1) the Tribe's action was precluded by collateral estoppel and/or res judicata, and (2) the Gambling Cruise Act does not confer upon the Tribe the right to offer video poker and similar electronic play devices on its Reservation as the Act does not alter the statewide ban on video poker. The Tribe appealed, and this Court certified the case for review pursuant to Rule 204(b), SCACR. We affirm in part and reverse in part.

## I. FACTS

Because the Tribe's litigation has a long and complex history, we begin with (1) a brief historical background, (2) a review of events leading to a 1993 Settlement Agreement, (3) a discussion of the Tribe's 2005 declaratory judgment action and this Court's opinion thereon in 2007, (4) an outline of the events culminating in the enactment of the Gambling Cruise Act of 2005, and (5) an examination of the 2012 declaratory judgment action that is now before this Court.

### (1) Historical Background

In the 1760 Treaty of Pine Hill, as confirmed by the 1763 Treaty of Augusta, the King of England and the Catawba Head Men and Warriors entered into an agreement in which the Catawba surrendered certain aboriginal territory in North Carolina and South Carolina to Great Britain in return for the right to settle on land located in South Carolina described as a "Tract of Land of Fifteen Miles square," comprised of 144,000 acres or 225 square miles. *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 499–500, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986); *see also* 25 U.S.C.A. § 941a(1) (2013) (describing treaties).

By 1840, the Catawba had leased most of this land to others. *South Carolina*, 476 U.S. at 501, 106 S.Ct. 2039. In 1840, the

Catawba entered into the Treaty of Nation Ford, in which the Catawba conveyed its interest in this tract of land to the State in exchange for the establishment of a new reservation and scheduled monetary payments. *Id.* In 1842, the State purchased a 630–acre tract as a new reservation for the Tribe, which then had a membership of about 450 persons, and the State held the land in trust for the Tribe. *Id.*

The Catawba subsequently maintained that the State did not perform all of its obligations under the agreement and, further, that the State did not have the authority to enter into the 1840 treaty based on federal provisions that prohibited the conveyance of tribal land without the consent of the United States. *Id.*

State officials and the Federal Government became involved in the situation, and in 1943, the Tribe, the State, and the Office of Indian Affairs of the Department of the Interior entered into a Memorandum of Understanding, by which the State purchased 3,434 acres of land and conveyed it to the United States to be held in trust for the Tribe; the State and the Federal Government agreed to make certain contributions to the Tribe; and the Tribe agreed to conduct its affairs based on the Federal Government's recommendations, but was not required to release its claims against the State. *Id.* at 501–02, 106 S.Ct. 2039.

During the ensuing years, Congress maintained some oversight of Indian affairs, but by 1953, it decided to make a change in its basic policy and to terminate its supervisory responsibilities for Indian tribes, marking the beginning of a "termination era" that lasted until the 1960s.[1] *Id.* at 503, 106 S.Ct. 2039. During this time, after consultation with the Catawba, it was decided that an end to federal control was desired by all parties. *Id.* at 503–04, 106 S.Ct. 2039.

In 1959 Congress enacted the Catawba Indian Tribe Division of Assets Act ("CITDA Act"), 25 U.S.C.A. §§ 931–938,

---

1. Between 1954 and 1962, Congress actually passed twelve separate "Termination Acts," the eleventh of which is the "Catawba Act." *Id.* at 504 n. 11, 106 S.Ct. 2039. Section 5 of the Catawba Act provides that "the laws of the several States shall apply to [the Catawba] in the same manner they apply to other persons or citizens within their jurisdiction." *Id.* at 505, 106 S.Ct. 2039.

which distributed to the enrolled members of the Tribe the 3,434–acre reservation acquired in 1943. *Id.* at 504, 106 S.Ct. 2039. Among other things, the CITDA Act provided "that state laws shall apply to members of the Tribe in the same manner that they apply to non-Indians." *Id.* (citing § 935 of the CITDA Act).

## (2) Events Resulting in 1993 Settlement Agreement

In 1980, the Catawba brought an action seeking possession of the 225–square–mile tract of land in South Carolina and trespass damages for the period of its dispossession. *Id.* at 505, 106 S.Ct. 2039. By that time, some 27,000 persons claimed title to different parcels within the tract. *Id.* at 499, 106 S.Ct. 2039. The United States Supreme Court issued an opinion in 1986 finding the statute of limitations applied to the Tribe's claim, but it did not reach the question whether it barred the claim. *Id.* at 499–500, 106 S.Ct. 2039.

In 1993, after many years of litigation and extensive negotiations, the Catawba, the State, and the United States entered into a settlement that ended the dispute over the right to possession of the 144,000 acres of land located in York, Lancaster, and Chester counties. *Catawba Indian Tribe of S.C. v. State,* 372 S.C. 519, 522, 642 S.E.2d 751, 752 (2007). This 1993 Settlement Agreement has been codified in both federal legislation[2] and state legislation (the "State Act")[3] that implements the agreement. *Id.* at 522–23, 642 S.E.2d at 752–53. The federal legislation requires the Settlement Agreement and the State Act to be complied with as if they had been implemented by federal law. *Id.* at 523, 642 S.E.2d at 753 (citing 25 U.S.C.A. § 941b(a)(2) (2001)).

Under the terms of the settlement, the Catawba waived its right to be governed by the Indian Gaming Regulatory Act ("IGRA").[4] *Id.; see* 25 U.S.C.A. § 941*l* (a) (2013) ("The [IGRA] shall not apply to the Tribe."). Instead, the Catawba agreed to be governed by the terms of the Settlement Agree-

2.  25 U.S.C.A. §§ 941 to 941n (2013) (federal codification of settlement).

3.  S.C.Code Ann. §§ 27–16–10 to –140 (2007) (State Act).

4.  25 U.S.C.A. §§ 2701–2721 (2013) (IGRA).

ment and the State Act as pertains to games of chance. *Catawba Indian Tribe,* 372 S.C. at 523, 642 S.E.2d at 753.

As is relevant here, the State Act and the Settlement Agreement both provide: "The Tribe may permit on its Reservation video poker or similar electronic play devices to the same extent that the devices are authorized by state law." S.C.Code Ann. § 27–16–110(G) (2007); Settlement Agreement § 16.8. At the time the Settlement Agreement was executed in 1993, video poker was legal in South Carolina. Thereafter, in 1999, the South Carolina General Assembly passed a statewide ban on the possession and operation of video poker devices. S.C.Code Ann. § 12–21–2710 (2000); Act No. 125, 1999 S.C. Acts 1319 (effective July 1, 2000).

### (3) First Declaratory Judgment Action in 2005

In 2005, the Tribe brought a declaratory judgment action against the State and the Attorney General seeking, *inter alia,* a declaration that, despite the enactment of the statewide ban in section 12–21–2710, it had a present and continuing right to utilize video poker or similar electronic play devices on its Reservation. *Catawba Indian Tribe,* 372 S.C. at 523, 642 S.E.2d at 753. The Tribe contended the terms of the Settlement Agreement (§ 16.8) and the State Act (S.C.Code Ann. § 27–16–110(G)) authorized video poker to the same extent allowed by state law, and video poker was legal at the time the parties executed the Settlement Agreement. *Id.*

In 2007, this Court issued its opinion holding the Tribe's right to video poker under the Settlement Agreement is subject to future changes in state law, as contemplated in the language of the cited provisions. *Id.* at 529 n. 8, 642 S.E.2d at 592 n. 8. Using the plain and ordinary meaning of the terms, the Court determined the legislative intent was for the Tribe to be allowed to have video poker on its Reservation "to the same extent state law authorizes the devices," and we specifically found "[t]he language of § 27–16–110(G) is unambiguous." *Id.* at 525–26, 642 S.E.2d at 754–55. The Court concluded the Tribe could no longer permit video poker on its Reservation because the possession and operation of video poker devices was presently banned by section 12–21–2710. *Id.* at 527 n. 7 & 530, 642 S.E.2d at 755 n. 7 & 757.

## (4) Events Culminating in S.C.'s Gambling Cruise Act of 2005

The Tribe has now brought a second declaratory judgment action that involves interpretation of the Gambling Cruise Act. This legislation was enacted approximately two months before the Tribe's first declaratory action was initiated in 2005, but no question was raised regarding the Gambling Cruise Act in that first action. An overview of the events culminating in the passage of this legislation will be helpful before considering the Tribe's current declaratory judgment action.

In 1951, Congress enacted what has become known as the Johnson Act, now found at 15 U.S.C.A. §§ 1171 to 1178, to prohibit the use and possession of gambling devices in interstate and foreign commerce, as well as in specified jurisdictions. *Brizill v. Dist. of Columbia Bd. of Elections & Ethics,* 911 A.2d 1212, 1214 (D.C.2006). Until 1992, federal law prohibited gambling on any ship operating under the United States flag. *Stardancer Casino, Inc. v. Stewart,* 347 S.C. 377, 380, 556 S.E.2d 357, 358 (2001) (citing the Gambling Ship Act, 18 U.S.C.A. §§ 1081–1084, and the Johnson Act, 15 U.S.C.A. §§ 1171–1178).

United States flag ships were placed at a competitive disadvantage because vessels under foreign flags were not prevented from offering gambling once the ship was beyond state territorial waters. *Id.* In response to this situation, in 1992 Congress amended § 1175 of the Johnson Act. *Id.* The Johnson Act still generally prohibits the use or possession of gambling devices on United States flag ships in § 1175(a), but under an exception in § 1175(b), the possession or transport of a gambling device within state territorial waters is not a violation of this prohibition *if* the device remains on board the vessel and is used only *outside* those territorial waters. *Palmetto Princess, L.L.C. v. Georgetown County,* 369 S.C. 34, 37, 631 S.E.2d 68, 70 (2006). The exception does not apply, however, if a state in which the voyage begins and ends has enacted a statute prohibiting gambling day cruises. *Id.* at 37–38, 631 S.E.2d at 70 (citing 15 U.S.C.A. § 1175(b)(2)(A)). "Thus, 'day cruises' ... may be subject to **federal** criminal prosecution under § 1175(a) if they begin and end in a state that 'has enacted a statute the terms of which prohibit that

use...." *Stardancer,* 347 S.C. at 380, 556 S.E.2d at 358–59 (citing § 1175(b)(2)(A)).

When the General Assembly amended section 12–21–2710 in 1999 to ban the possession and operation of video poker devices, it included an intent clause that states in part: "The General Assembly by enactment of this act has no intent to enact any provision allowed by 15 U.S.C. § 1175, commonly referred to as the Johnson Act, or to create any state enactment authorized by the Johnson Act." *Id.* at 385 & n. 12, 556 S.E.2d at 361 & n. 12 (citing § 22(B) of 1999 Act No. 125).

Since the State did not "opt out" of the Johnson Act, gambling day cruises, i.e., "cruises to nowhere" that went outside the state's territorial waters for gambling, were legal under federal law. Because of this, coastal counties and municipalities began adopting local ordinances banning gambling day cruises that left from within their boundaries. However, this Court held in a series of decisions that local governments did not possess the authority to ban such cruises because the plain language of the Johnson Act indicated that only *a state,* not a political subdivision of a state, could prohibit those cruises, and our General Assembly had elected not to enact a statute prohibiting the "cruises to nowhere." *See, e.g., Palmetto Princess, L.L.C. v. Town of Edisto Beach,* 369 S.C. 50, 631 S.E.2d 76 (2006); *Palmetto Princess, L.L.C. v. Georgetown County,* 369 S.C. 34, 631 S.E.2d 68 (2006).

To resolve this impasse, in 2005 the General Assembly enacted the Gambling Cruise Act. S.C.Code Ann. §§ 3–11–100 to –500 (Supp.2013). With certain exceptions, the General Assembly delegated to municipalities and counties "the authority conferred to this State by the United States Congress pursuant to the Johnson Act, as amended, 15 U.S.C. Sections 1171 through 1177[,] ... to regulate or prohibit gambling aboard gambling vessels while such vessels are outside the territorial waters of the State, when such vessels embark or disembark passengers within their respective jurisdictions for voyages that depart from the territorial waters of the State, sail into United States or international waters, and return to the territorial waters of the State without an intervening stop." *Id.* § 3–11–200(A); *see also id.* § 3–11–300(B).

The Gambling Cruise Act explicitly states in pertinent part that it "must not be construed to ... repeal or modify any other provision of law relating to gambling" or to "allow or permit gambling aboard any vessel, gambling vessel, or passenger cruise liner *within the territorial waters of the State* [.]" *Id.* § 3–11–400(B)(1), (3) (emphasis added).

### (5) Current Declaratory Judgment Action Filed in 2012

On January 24, 2012, the Tribe filed the current declaratory judgment action in Richland County against the State seeking a declaration as to its rights under the Settlement Agreement and the State Act based on the enactment of the Gambling Cruise Act. Specifically, the Tribe contended the Gambling Cruise Act constituted an "authorization" of video poker, and if video poker is permitted anywhere in the state, the Tribe should be allowed to exercise the same right upon its Reservation. The State argued this Court's 2007 *Catawba* opinion was dispositive because it determined the Tribe did not have the right to offer video poker on its Reservation as the use or possession of video poker devices was banned statewide. The State contended the Tribe's action was precluded by collateral estoppel and res judicata, and that its assertions regarding the Gambling Cruise Act failed as a matter of law.

The parties filed cross-motions for summary judgment. The circuit court granted summary judgment to the State. The circuit court found the Tribe's action was precluded by the doctrine of collateral estoppel and/or the doctrine of res judicata. In addition, the circuit court found the Gambling Cruise Act was not an authorization of video poker and it did not alter the statewide ban on video poker, which remained in force. Thus, section 16.8 of the Settlement Agreement and the State Act did not require the State to allow the Tribe to offer video poker on its Reservation. The Tribe appealed to the Court of Appeals. This Court certified the case for its review pursuant to Rule 204(b), SCACR.

## II. STANDARD OF REVIEW

Rule 56(c) of the South Carolina Rules of Civil Procedure states a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In determining whether any triable issues of fact exist, the trial court must view the evidence and all reasonable inferences that may be drawn therefrom in the light most favorable to the party opposing summary judgment. *Brockbank v. Best Capital Corp.*, 341 S.C. 372, 534 S.E.2d 688 (2000). "An appellate court reviews the granting of summary judgment under the same standard applied by the trial court pursuant to Rule 56, SCRCP." *Id.* at 379, 534 S.E.2d at 692.

■ Each side in this dispute asserts the case involves a legal question, i.e., an analysis of the Gambling Cruise Act and a determination of its impact on the Tribe's Settlement Agreement. "Determining the proper interpretation of a statute is a question of law, and this Court reviews questions of law de novo." *Town of Summerville v. City of N. Charleston*, 378 S.C. 107, 110, 662 S.E.2d 40, 41 (2008).

## III. LAW/ANALYSIS

### A. Preclusion of Declaratory Judgment Action

The Tribe first contends the circuit court erred in finding its declaratory judgment action is precluded by collateral estoppel and/or res judicata. We agree.

■ "Collateral estoppel occurs when a party in a second action seeks to preclude a party from relitigating an issue which was decided in a previous action." *S.C. Prop. & Cas. Ins. Guaranty Ass'n v. Wal–Mart Stores, Inc.*, 304 S.C. 210, 213, 403 S.E.2d 625, 627 (1991). In *Wal–Mart Stores, Inc.*, this Court adopted the general rule set forth in the Restatement (Second) of Judgments § 27 (1982). *Id.* "Section 27 provides that *when an issue of fact or law* is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *Id.* (emphasis added).

■ Stated another way, "[t]he party asserting collateral estoppel must demonstrate that the issue in the present lawsuit was: (1) actually litigated in the prior action; (2)

directly determined in the prior action; and (3) necessary to support the prior judgment." *Carolina Renewal, Inc. v. S.C. Dep't of Transp.*, 385 S.C. 550, 554, 684 S.E.2d 779, 782 (Ct.App.2009).

The doctrine of collateral estoppel is also known as "issue preclusion." *In re Crews*, 389 S.C. 322, 698 S.E.2d 785 (2010); *Zurcher v. Bilton*, 379 S.C. 132, 666 S.E.2d 224 (2008); *Shelton v. Oscar Mayer Foods Corp.*, 325 S.C. 248, 481 S.E.2d 706 (1997). Issue preclusion bars the relitigation of only the particular issues that were actually litigated and decided in the prior suit. *Crestwood Golf Club, Inc. v. Potter*, 328 S.C. 201, 493 S.E.2d 826 (1997). As a result, the doctrine of collateral estoppel is inapplicable when the argument turns on an assertion that the other party *should* have litigated a particular issue in the prior action. *See id.* at 216, 493 S.E.2d at 835.

The doctrine of res judicata is a distinguishable concept. *Beall v. Doe*, 281 S.C. 363, 369 n. 1, 315 S.E.2d 186, 190 n. 1 (Ct.App.1984). Res judicata encompasses both issue preclusion and claim preclusion. *Crestwood Golf Club, Inc.*, 328 S.C. at 216, 493 S.E.2d at 834. However, res judicata is more commonly referred to simply as claim preclusion. *Garris v. Governing Bd. of S.C. Reinsurance Facility*, 333 S.C. 432, 449, 511 S.E.2d 48, 57 (1998). Claim preclusion bars plaintiffs from pursuing a later suit where the claim (1) was litigated or (2) could have been litigated. *Crestwood Golf Club, Inc.*, 328 S.C. at 216, 493 S.E.2d at 835.

Our Court has recently reaffirmed the following statement of the doctrine:

> Res judicata bars subsequent actions by the same parties when the claims arise out of the same transaction or occurrence that was the subject of a prior action between those parties. Under the doctrine of res judicata, "[a] litigant is barred from raising any issues which were adjudicated in the former suit and any issues which might have been raised in the former suit."

*Plum Creek Dev. Co. v. City of Conway*, 334 S.C. 30, 34, 512 S.E.2d 106, 109 (1999) (alteration in original) (citations omitted), *cited with approval in Judy v. Judy*, 393 S.C. 160, 172, 712 S.E.2d 408, 414 (2011).

Res judicata may be applied if (1) the identities of the parties are the same as in the prior litigation, (2) the subject matter is the same as in the prior litigation, and (3) there was a prior adjudication of the issue by a court of competent jurisdiction. *Johnson v. Greenwood Mills, Inc.*, 317 S.C. 248, 250–51, 452 S.E.2d 832, 833 (1994). The doctrine of res judicata is not an "ironclad bar," however, to a later lawsuit. *Judy*, 393 S.C. at 167, 712 S.E.2d at 412; *Garris*, 333 S.C. at 449, 511 S.E.2d at 57; *Clark v. Aiken Cnty. Gov't*, 366 S.C. 102, 109, 620 S.E.2d 99, 102 (Ct.App.2005).

The circuit court noted that the Tribe's first declaratory judgment action was brought on July 28, 2005, almost two months after the Gambling Cruise Act took effect on June 1, 2005. The court found the Tribe relied upon section 27–16–110(G) in that action and had asked for a determination of its rights, under the Settlement Agreement and the State Act, to operate video poker or similar electronic play devices on its Reservation. The court acknowledged that the Tribe "made a somewhat different legal argument in the first action than now, contending that the Settlement Agreement and § 27–16–110(G) could not be 'amended' by the General Assembly based upon any future ban placed upon video poker." However, the circuit court stated that in the first declaratory judgment action in 2005, "the Tribe *also had the opportunity* to make the same legal arguments it is now presenting. In such circumstances, *res judicata* or collateral estoppel bars the second suit."

As an initial matter, we note the circuit court's full ruling discusses the law pertaining to res judicata, but it does not appear to delineate or distinguish the elements of collateral estoppel. Moreover, the doctrine of collateral estoppel is inapplicable when the argument turns on an assertion that the other party *should* have litigated a particular issue in the prior action. *Crestwood Golf Club, Inc.*, 328 S.C. at 216, 493 S.E.2d at 835.

We find collateral estoppel is not applicable because the issue decided in the 2005 declaratory judgment action is not the same as the issue asserted in the current action. In the prior case, the Tribe sought a declaration that any changes in state law did not affect its vested right to offer video poker on

its Reservation based on the terms of the Settlement Agreement (section 16.8) and the State Act (section 27–16–110(G)). In particular, the Tribe maintained the ban on video poker in section 12–21–2710 did not apply to it because the ban was enacted after the Settlement Agreement. In the 2007 *Catawba* opinion, this Court found that the language of the Settlement Agreement and the associated statute that authorized the Tribe to offer video poker "to the same extent" it is allowed by South Carolina law was intended to make the Tribe subject to the same law as all South Carolina citizens, and this necessarily contemplated any changes in the law would apply to the Tribe. Thus, the ban in section 12–21–2710 was equally applicable to the Tribe.

In contrast, in the current action the Tribe does not dispute that changes in state law are applicable to the Tribe's agreement. The Tribe now contends that enactment of the Gambling Cruise Act amounts to an "authorization" of video poker in South Carolina; therefore, under the terms of its Settlement Agreement and the State Act, it should be allowed to offer video poker "to the same extent" on its Reservation. The Tribe is seeking a declaratory judgment as to the interpretation and import specifically of the Gambling Cruise Act on its gaming rights. This is a distinguishable issue. The Gambling Cruise Act was never raised by the parties or addressed by any court in the first action and, contrary to the State's argument in brief, a review of the Act was not necessary to a determination of the question there. Since the current issue was not actually litigated in the prior action, the State has not met its burden of demonstrating that collateral estoppel should be applied.

As to res judicata, we also find it is not preclusive here. Although res judicata normally applies to issues that were previously raised or that could have been raised in the prior action, declaratory judgments are distinguishable. As one legal treatise has observed, res judicata does apply to declaratory judgments, but only as to issues *actually decided* by the court:

Suits for declaratory judgments do not fall within the rule that a former judgment is conclusive not only of all matters actually adjudicated thereby but, in addition, also of all

matters which could have been presented for adjudication. *A declaratory judgment is not res judicata as to matters not at issue and not passed upon. Unlike other judgments, a declaratory judgment determines only what it actually decides and does not preclude, under res judicata principles, other claims that might have been advanced.*

22A Am.Jur.2d *Declaratory Judgments* § 244 (2013) (emphasis added) (footnotes omitted); *see also* 50 C.J.S. *Judgments* § 944 (2009) ("[A] declaratory action determines only what it actually decides and does not have a claim preclusive effect on other contentions that might have been advanced."); Restatement (Second) of Judgments § 33 (1982) ("A valid and final judgment in an action brought to declare rights or other legal relations of the parties is conclusive in a subsequent action between them *as to the matters declared,* and, in accordance with the rules of issue preclusion, *as to any issues actually litigated by them and determined in the action.*" (emphasis added)).

Citing *Robison v. Asbill,* 328 S.C. 450, 492 S.E.2d 400 (Ct.App.1997), the circuit court appears to have found this concept applies only when a party is seeking additional, coercive relief following a successful ruling in a declaratory judgment action. However, this reading imposes an additional restriction that is not articulated in the case law or the legal treatises. The success or failure of the Tribe's prior action is not determinative as to whether res judicata is appropriate. The Restatement makes clear that a declaratory judgment decides only what it actually decides, and the fact that the plaintiff lost a prior action does not vitiate this principle. *See* Restatement (Second) of Judgments § 33 cmt. c (1982) ("A plaintiff who has lost a declaratory judgment action may also bring a subsequent action for other relief, subject to the constraint of the determinations made in the declaratory action. The theory is the same: a declaratory [judgment] action determines only what it actually decides and does not have a claim preclusive effect on other contentions that might have been advanced.").

In this case, the ruling that is entitled to res judicata effect is the determination made in the first action that the Tribe's video poker rights are affected by future changes in state law, including the statewide ban enacted in section 12–21–2710.

The question raised in the current declaratory judgment is, accepting that principle, what is the effect of the 2005 Gambling Cruise Act on the Tribe's rights? This issue was not actually decided in the prior action. Consequently, we agree with the Tribe's contention that its current declaratory judgment action is not precluded by the doctrine of res judicata.

## B. Effect of Gambling Cruise Act on Tribe's Rights

The Tribe next contends the circuit court erred in granting summary judgment to the State after finding the Gambling Cruise Act did not amount to an "authorization" of video poker and similar electronic play devices in South Carolina. The Tribe asserts "[t]he State's enactment of the Gambling Cruise Act is an authorization that triggers the Catawba Nation's right to offer video poker and similar electronic devices on its Reservation pursuant to § 16.8." We disagree.

The clear terms of the Gambling Cruise Act itself support a finding that it does not alter the statewide ban on video poker, as the General Assembly explicitly provided that the Gambling Cruise Act "must not be construed to ... repeal or modify any other provision of law relating to gambling" or to "allow or permit gambling aboard any vessel, gambling vessel, or passenger cruise liner within the territorial waters of the State[.]" S.C.Code Ann. § 3–11–400(B)(1), (3) (Supp.2013). The State correctly asserts, "Video gaming is currently banned in South Carolina and the Tribe's reliance upon legislation regulating 'cruises to nowhere' does not lift, alter, or modify that ban. If it did, [then] everyone in South Carolina could take advantage of the Gambling Cruise Act and could ignore the prohibition upon video gaming in the State."

Section 12–21–2710 is currently the law in South Carolina, and it imposes a statewide ban on such video gambling devices:

It is unlawful for any person *to keep on his premises or operate* or permit to be kept on his premises or operated within this State any vending or slot machine, or any video game machine with a free play feature operated by a slot in which is deposited a coin or thing of value, or other device operated by a slot in which is deposited a coin or thing of

value for the play of poker, blackjack, keno, lotto, bingo, or craps....

S.C.Code Ann. § 21–21–2710 (2014) (emphasis added). In enacting the Gambling Cruise Act, the General Assembly specifically stated that it shall not be construed to repeal or modify existing law. S.C.Code Ann. § 3–11–400(B)(1), (3). This Court has confirmed the continued viability of this statutory scheme in the recent case of *Union County Sheriff's Office v. Henderson*, 395 S.C. 516, 519–20, 719 S.E.2d 665, 666 (2011) ("Section 12–21–2710 makes it unlawful to possess illegal gambling machines, even if they are not fully operational. The mere possession of gambling devices, or even their component parts, is unlawful.").

The Tribe avers that it is allowed to offer gambling "to the same extent" allowed by state law, and "extent" should be given "its literal and ordinary meaning." The Tribe maintains the circuit court improperly added a "geographical restriction to § 16.8 of the [Settlement] Agreement" as "[t]he issue is 'what' activity the State has authorized, not 'where' the authorized activity may take place." The Tribe argues it should not be required "to have an ocean" to be able to exercise the same rights to video poker as found elsewhere in the state, and there is "no geographical component" in the Settlement Agreement.

We find the Tribe's assertion that it "does not need to have an ocean" to exercise the same rights unavailing because its interpretation of the Gambling Cruise Act, the Settlement Agreement, and the State Act contravenes the unambiguous terms of the provisions at play here. Contrary to the Tribe's assertions, the prohibition on video poker is being applied to the Tribe "to the same extent" provided by state law. The ban on video poker devices remains in force throughout the territorial limits of South Carolina, including the State's territorial waters. Nothing has changed in that regard.

Gambling outside the State's territorial waters aboard cruises to nowhere was legal in South Carolina pursuant to federal law in the Johnson Act years before the Gambling Cruise Act was enacted. Thus, the Gambling Cruise Act did not "authorize" video poker. Nor can it be deemed an "authorization" of video poker inside the jurisdictional boundaries of South Car-

olina. For purposes of analogy only, the State points to an unreported decision from the United States District Court for the Southern District of Florida, *Seminole Tribe of Florida v. Florida,* 1993 WL 475999 (S.D.Fla.1993). That case involved the Indian Gaming Regulatory Act, or IGRA, which the State acknowledges does not apply to the Tribe since the Tribe opted out of the IGRA in its Settlement Agreement.[5] However-er, the State cites it for the federal court's finding that Florida's authorization of "cruises to nowhere" did not under-mine that state's existing prohibition against gaming and it did not serve to authorize casino gambling "within the State."

In our view, the Gambling Cruise Act merely delegates the State's authority to opt out of the federal Johnson Act to political subdivisions, such as cities and counties. Under any interpretation, the Gambling Cruise Act does not authorize the utilization of video poker devices anywhere in the State's territorial limits, be it on land or within the State's territorial waters.

The Tribe states its gaming rights are unique and that it is "*not* 'like everyone else' in South Carolina with regard to gaming rights, and [it] should not be treated 'like everyone else.'" In this regard, the Tribe notes: "For example, mem-bers of the Catawba Nation are the beneficiaries of a Tribal Trust Fund, are exempt from certain federal and state income taxes, and are exempt from state and county taxes on personal property, including automobiles. In addition, the Catawba Nation's real property is exempt from county and state prop-erty taxes, sales on the Reservation are exempt from sales taxes, and it has the right to operate for-profit high-stakes bingo games."

---

5. Congress passed the IGRA in 1988, and it expressly permits gambling on Indian reservations under certain prescribed circumstances. *Brizill v. Dist. of Columbia Bd. of Elections & Ethics,* 911 A.2d 1212, 1216 n. 7 (D.C.2006). Because of this, gambling casinos are legal on many Indian reservations despite the prohibitions of § 1175 of the Johnson Act. *Id.; see also* Deborah F. Buckman, *Interplay Between Indian Gaming Regulatory Act and Johnson Act,* 2 A.L.R. Fed. 2d 241, 241 (2005) ("The [IGRA] ... was enacted in 1988 in order to provide a statutory basis for the operation of gaming by Indian tribes and to balance tribal interests with those of the states in which they were located.").

544

We agree the Tribe is not treated the same as everyone else in certain respects of the law. However, none of the examples pointed out by the Tribe involve video poker. Moreover, in regards to "video poker or similar electronic play devices," the Tribe has specifically agreed to be treated like everyone else. We hold the circuit court correctly determined the Gambling Cruise Act does not authorize the Tribe to offer video poker on its Reservation.

## IV. CONCLUSION

We conclude the Tribe's action is not precluded by collateral estoppel or res judicata and reverse this finding by the circuit court. We affirm, however, the circuit court's determination that the Gambling Cruise Act does not authorize the Tribe to offer video poker on its Reservation in contravention of the existing statewide ban on video gambling devices.

**AFFIRMED IN PART, REVERSED IN PART.**

PLEICONES, Acting Chief Justice, KITTREDGE, HEARN, JJ., and Acting Justice Ralph Keith Kelly, concur.