PREHEARING REPORT

THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS
PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
Carolyn Sargent, Appellant,
In Re:  Willie Sargent, Employee,
 v.
International Paper Co.,Respondent.
 
 
 

Appeal From Georgetown County
 Jackson V. Gregory, Circuit Court Judge

Unpublished Opinion No. 2005-UP-553
Submitted October 1, 2005  Filed October 17, 2005   

AFFIRMED

 
 
 
Thomas J. Rubillo, of Georgetown, for Appellant.
Kirsten Leslie Barr, of Mt. Pleasant, Roy Allen Howell, III, of  Mt. Pleasant, for Respondent.
 
 
 

PER CURIAM:  In this workers compensation action, Carolyn Sargent appeals the trial courts order affirming the order of the South Carolina Workers Compensation Commission (Commission) denying benefits to Carolyn for the death of her husband, Willie Sargent.  We affirm.1
FACTUAL/PROCEDURAL BACKGROUND
This case involves the unfortunate and untimely death of a conscientious, long-time employee of International Paper.  Carolyn Sargent filed a workers compensation claim against International Paper asserting her husband sustained an injury by accident to his lungs resulting in his death.  At the hearing before the Single Commissioner, Carolyn took the position that Willies death resulted from his accidental exposure to chlorine dioxide (ClO2).  Specifically, Carolyn maintained Willie was working as a mechanic when he went to repair a pump that contained ClO2 and, as he was working on the machine, he caught a pretty good dose of it.  Her position was that Willie died from pneumonia that was induced, at least in part, by exposure to the chemical.  
The record shows Willie Sargent was employed at International Paper as a Service Operator I.  His duties were testing and trouble shooting, which involved checking on jobs to see if there were any problems.  Luther Davis testified that he worked with Willie and held the same job at International Paper.  According to Davis, he worked with Willie on the Friday before Willie was admitted to the hospital, which would have been August 18, 2000.  The first time he saw Willie that day was around 6:30 a.m. in the lab, and Willie was doing pretty good at that time.  The two men parted company, and Davis thereafter saw Willie in the lab again.  Davis described Willies physical condition at that time as pretty good.  Willie was called to check on a pump at the KMYR digester, and Davis was called to assist him.  After the two opened a valve, Willie was again called away, this time to go to a job on the pine decker.  Thereafter when Davis saw Willie, Willie was coughing pretty forcefully.  Davis had worked on the C line that day where there was  a little, small ClO2 leak.  When he last saw Willie before he observed him coughing, Willie was headed in the direction of the C line of the plant.  However, the place that Willie was ultimately going to was not the C line, but was the pine decker.  Davis testified that if there were any problems on the jobs they checked, they normally would not fix anything, but would just report the problem.  Davis specifically testified Willie would not have been performing any repairs on a leak on the C line when he was called away.  Although he was not sure, Davis thought he told Willie about the leak he had discovered on the C line that morning.  However, he stated that people would still walk through the area knowing of a leak because the C line is outside, in the open air.  
Thomas Carucci, International Papers safety manager, testified regarding the plants protocol following an employees exposure to ClO2.  Carucci stated that after an employee reports an exposure, a green slip is used to document the occurrence and an investigation is immediately triggered.  If an exposure were reported, maintenance would be notified there was a leak, an analysis would be performed, and immediately things would be shut down and it would be taped off or roped off so no one could go into the area.  Carucci stated International Paper had no record of Willie reporting any problems due to exposure prior to his hospitalization and death.  Carucci further testified, if Willie had reported an exposure when he went to first aid on August 22, a green slip would have been filled out immediately and the area would have been tested and roped off.  Because it was not reported, no green form was filled out for Willie.  Carruci also testified that the C line was in a big, open area and was completely outside.  
Jacob Smith, the manufacturing manager at International Paper, testified regarding Willies position and his employment with the company.  Willie worked for a foreman who worked for Smith.  Willies responsibility was to walk a route throughout the manufacturing process to observe any kind of malfunction with the equipment in that area.  Willie would report any mechanical problems.  Smith testified Willie never performed any major repairs and if there were a mechanical malfunction that required repair work, maintenance would perform the work, as it was not a part of Willies job.  Smith had known Willie for twenty-nine years and stated Willie smoked quite a bit and had complained about breathing problems.  Willie was a very conscientious employee who was well trained and aware of the proper procedure to follow in the case of exposure to ClO2.  Prior to his death, Willie did not report he had been acutely exposed to ClO2.  Neither was there any record Willie reported any sort of mechanical problems between August 17 and Willies death on August 30.  According to Smith, if Willie had gotten a whiff of any significant amount of ClO2, he would have reported it.  
Willie did not work on Saturday, August 19 or Sunday, August 20, but did work a 3:00 to 11:00 shift on Monday, August 21.  On August 22, 2000, Willie went to see one of the companys occupational health nurses, Mary Ann Sutton.  At that time, Willie complained of not feeling well for two days and experiencing shortness of breath upon exertion.  He further complained of nausea and having a productive cough.  He had a temperature of 100 degrees.  Sutton found Willies chest sounded clear, she heard no wheezes, and there was no complaint of chest pain.  Sutton noted it appeared Willie had a flu-like illness.  She encouraged Willie to go home, but he indicated he had one and a half hours left on his shift that he wanted to finish.  Willie agreed he would call his doctor the next morning or visit the emergency room if his symptoms continued to increase.  
Sutton testified the company had policies and procedures in place whenever someone reported any inhalation of gas.  She stated an incident report and respiratory forms would be filled out, and management and the safety department would be notified.  Had Willie reported an exposure to ClO2 at that time, she would have filled out another document as well as her regular nurses notes.  This document is an occupational health nurse note that is on a green form.  Sutton testified that with an acute exposure to ClO2, the person would be aware of the exposure right away because it has a bad smell and is irritating.  The person would complain of a lot of burning in the throat.  She stated ClO2 is a strong respiratory irritant and that if a person could not get away from the area and inhaled a large amount, it would result in wheezing, shortness of breath, coughing, vomiting, and several hours later the person may develop pulmonary edema.  It is clear from Suttons notes and her testimony that Willie did not report any ClO2 exposure to her when he saw her on August 22.  
Carolyn Sargent testified before the Commission that she first became aware her husband was having problems with his health on Sunday, when [h]e was coughing and he was aching all over.  He had been off that day and the day before, but worked the day prior to that, and when he came home from work that day, he was not having any difficulty.  Willie went to see his doctor on Wednesday morning.  While there, the doctor called an ambulance to transport Willie to the hospital.  Willie died the following Wednesday morning.  Carolyn acknowledged she stated in her deposition that the first time Willie complained to her was on Tuesday night, August 22, but clarified that was the first time Willie complained about inhaling the ClO2 gas.  Carolyn agreed Willie had a history of smoking, at least for the twenty-six years she was married to him.  
The record further shows Willie was admitted to Georgetown Memorial Hospital on August 23, 2000.  Nursing notes reflect Willie stated ClO2  bleaching agent  was released into air last [Thursday] and Willie went [through] area 3 times in 10 [minutes].  One of the consulting physicians, Dr. Phillips, documented the following:  The patient states approximately a week or so ago he was exposed to a chemical spill at the plant.  He describes this being a chloride-based bleach spill.  Another consulting physician, Dr. Felzien, also noted, The patient was initially involved in a chemical spill felt to be some type of chloride-based chemical approximately one week prior to admission.  On evaluation, it was determined Willie had pneumonia and he was treated with multiple antibiotics.  While his condition initially improved, Willie died unexpectedly on August 30, 2000.  At the time of his death, Willie was forty-nine years old.  
An autopsy was performed on August 31, the day after Willies death.  The autopsy, performed by Dr. Proctor, included in the case summary that microscopic evaluation of the lungs revealed a prominent interstitial fibrosis with superimposed bronchopneumonia and aspergillus.  The case summary further provided as follows:  These findings are consistent with a longstanding interstitial fibrosis with superimposed broncopneumonia and subsequent abscess formation.  The possibility that this superimposed pneumonia was chemical related cannot be excluded.  In the death summary dictated in October 2000, Willies attending physician, Dr. Archambeau, stated cultures taken from Willie following his death grew out Aspergillus and he found Willies cause of death was [l]ikely overwhelming sepsis from Aspergillus pneumonia.  He noted, however, the final cause of death would be determined by the autopsy.  
Carolyn presented the medical report of Dr. Harley to support her position that the ClO2 exposure induced the pneumonia that led to Willies death.  Dr. Harley prepared an autopsy report in November 2000 finding the cause of Willies death to be [s]epsis complicating pneumonia, lung abscess, and empyema, superimposed on severe chronic interstitial fibrosis of lungs.  He noted in his report, In putting this altogether, it would appear that Mr. Sargent had a chronic interstitial fibrosis. . . . This had probably been present for years.  Superimposed on this, he developed an acute bronchopneumonia which may have been related to chemical exposure.  Thereafter, on January 3, 2003, Dr. Harley submitted a medical report and opinion.  Dr. Harley noted that Willie had more longstanding lung disease than was appreciated before his death, and while the ClO2 exposure did not cause the fibrosis, it did aggravate the already existing conditions.  He found the acute, probably bacterial pneumonia seen at autopsy, was most likely a superinfection secondary to an acute lung injury, and that lung injury was most probably from the ClO2 exposure.  He thus concluded, it is my opinion that the record supports the conclusion that the ClO2 exposure was a cause for initiating the acute infectious process in this case, resulting in Mr. Sargents death.  
International Paper countered with the opinions of Doctors Sahn, Proctor, Archambeau, and Russell, who all determined Willies death was most likely unrelated to his exposure to the chemical.  Dr. Sahn noted Willies history that he walked through an area three times in a ten minute period where ClO2 had been released into the air.  He observed that after Willie was admitted to the hospital, he was diagnosed with pneumonia and empyema, and eventually died with sepsis.  Dr. Sahn concluded, [A]fter review of the records and literature concerning chlorine inhalation, it is my opinion that the minimal and brief exposure to chlorine was unrelated to the development of a bacterial pneumonia and empyema several days later.  
Dr. Proctor indicated his autopsy evaluation revealed Willie had a severe underlying pulmonary fibrosis and he was at risk of developing pneumonia regardless of any chlorine exposure.  He noted the degree of fibrosis in Willies lungs developed over a long period of time and led to a serious compromise of his lung capacity and ability to clear his lungs.  Dr. Proctor concluded Willie had longstanding pulmonary fibrosis, he was at risk of developing infection without chemical exposure, and the pneumonia most likely occurred as the result of his compromised pulmonary status rather than as a chemical induced pneumonia.  
Dr. Archambeau, Willies attending physician, stated he was in agreement with Dr. Sahns report that [Willies] problems leading to his death were probably not related to his alleged exposure to chlorine.  He opined that Willies previous history of bullous emphysema and his diagnosis of bacterial pneumonia on admission led to the cause of his death.   
Finally, in November 2002, Dr. Roger Russell performed an extensive evaluation to determine whether the acute illness that led to Willies death was an occupational disease or whether Willies alleged chemical exposure exacerbated a preexisting condition, contributing to his demise.  In preparing his evaluation, Dr. Russell reviewed, among other things, Willies hospital medical records, Dr. Proctors autopsy report, Dr. Harleys report, Willies health records from International Paper, Willies Pulmonary Function Test Results from 1989 to 1997, Dr. Sahns report, and the various depositions of Carolyn Sargent and International Paper employees.  Dr. Russell noted the history given by Willie in the emergency room that he became short of breath approximately a week before, after passing through an area at work three times where there were ClO2 fumes.  Dr. Russell found the symptoms Willie complained of to the plant nurse clearly indicated he had a pneumonia caused by microorganisms as opposed to a chemical pneumontis.  He also observed the autopsy findings showed conclusively that Willie had extensive, chronic pulmonary fibrosis that predated the alleged chemical exposure and the fungal pneumonia of which Willie died.  Dr. Russell concluded as follows:

Mr. Willie Sargent had a severely compromised respiratory system, both from pulmonary fibrosis and from cigarette smoking.  He developed a mixed bacterial and fungal pneumonia, lung abscess, and empyema which responded in part to the removal of 600 cc of purulent fluid from the pleural space of his left lung and antibiotic therapy (antibiotics kill bacteria but not fungi).  He ultimately died from respiratory failure.  Fungi were first noted at autopsy and only identified weeks after his demise.  The pneumonia of which he died was caused by the introduction of microorganisms into his respiratory tract that his chronically diseased lungs were unable to clear.  Further, Mr. Sargent had a very shortened life expectancy due to the pulmonary fibrosis that was relentlessly converting his lungs into scar tissue.  He outlived the life expectancy of the average patient with pulmonary fibrosis.
In summary, it is my opinion within a reasonable degree of medical certainty that brief exposures to ClO2 fumes on or about August 17, 2000 would not have caused, aggravated, or accelerated the development of Mr. Sargents pneumonia, lung abscess, and empyema since his natural lung defense mechanisms against microorganisms were completely destroyed long ago by cigarette smoke and pulmonary fibrosis.

Dr. Russells opinion was unchanged after reading Dr. Harleys January 3, 2003 report.  
The Single Commissioner made, inter alia, the following findings of fact:  (1) Willie was not exposed to any significant concentration of ClO2 as asserted by Carolyn, (2) at no time did Willie report any work related injury or accident to his employer, (3) Dr. Harleys opinion carried little weight as it was based upon an inaccurate hypothetical set of facts, (4) the greater weight of the evidence in the record indicates Willies death was not causally related to his employment or any alleged exposure to ClO2 and (5) Willie did not sustain an injury by accident arising out of and in the course of his employment.  Accordingly, the Commissioner determined Carolyn was not entitled to benefits.  
The Full Commission affirmed the Single Commissioner, adopting the Single Commissioners findings in full.  Following a hearing on the matter, the circuit court found the decision of the Full Commission was supported by substantial evidence in the record and affirmed that decision.  This appeal follows.
ISSUES

 
 
 I. 
 Was the exclusion of evidence of an excited utterance by the employee conveying a present sense impression of why he was suffering from respiratory distress a clearly unwarranted abuse of discretion?
 
 
 II. 
 Was the exclusion of the opinion of the pathologist who performed the final autopsy in this case a clearly unwarranted abuse of discretion and the product of an error of law?
 
 
 III. 
  Was the finding below that there was no evidence of chemical exposure, reports of the exposure, or complaints about it the result of an error of law?
 
 
 IV.  
 Is the decision below clearly contrary to the substantial, reliable and probative evidence in the record when taken as a whole?
 
 

STANDARD OF REVIEW
The Administrative Procedures Act establishes the standard of review for decisions by the South Carolina Workers Compensation Commission.  Lark v. Bi-Lo, Inc., 276 S.C. 130, 135, 276 S.E.2d 304, 306 (1981); Adkins v. Georgia-Pacific Corp., 350 S.C. 34, 36-37, 564 S.E.2d 339, 340 (Ct. App. 2002).  In workers compensation cases, the Full Commission is the ultimate fact finder and the final determination of witness credibility and the weight to be accorded evidence is specifically reserved to the Full Commission.  Shealy v. Aiken County, 341 S.C. 448, 455, 535 S.E.2d 438, 442 (2000).  It is not the task of this Court to weigh the evidence as found by the Full Commission.  Id.  
In an appeal from the South Carolina Workers Compensation Commission, this court may reverse or modify a decision if the findings or conclusions of the commission are clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record.  S.C. Code Ann. § 1-23-380(A)(6) (2005).  Neither this court nor the circuit court can substitute its judgment for that of the Commission as to the weight of the evidence on questions of fact.  Id.  Substantial evidence is not a mere scintilla of evidence nor evidence viewed from one side, but such evidence, when the whole record is considered, as would allow reasonable minds to reach the conclusion the Full Commission reached.  Shealy, 341 S.C. at 455, 535 S.E.2d at 442.
LAW/ANALYSIS
I.       Exclusion of statement by employee
Carolyn first asserts error in the exclusion of a statement made by Willie to Davis on the last day the two men worked together.  The record shows that during the hearing before the Single Commissioner, counsel for Carolyn asked about the occasion Davis observed Willie coughing hard.  When counsel asked what Davis had said to Willie, Davis replied, I asked him, I said, man, Willie, you are looking sort of bad.  Youre looking bad right now.  He said, man --.  At this point, counsel for International Paper objected.  Carolyn maintained the statement made at that time by Willie to Davis was a spontaneous utterance made in direct response to an inquiry and, as such, was an exception to the hearsay rule.  Unable to understand from the testimony where [Willie] had just been prior to the statement, the Commissioner sustained the objection.  During his deposition, Davis testified that Willies response to Davis expression of concern was, I got gassed.  
On appeal, Carolyn argues the exclusion of the statement by Willie that he got gassed was an abuse of discretion in that the statement qualified as an exception to the hearsay rule under both the old rules, as a spontaneous utterance and thereby qualifying for admission under the res gestae exception, and the new rules as a present sense impression or excited utterance.  We do not need to determine whether the Commissioner erred in excluding this statement, however, as this statement was merely cumulative to other evidence that Willie may have sustained some exposure to ClO2.
First, Carolyns testimony before the Commissioner included that Willie had complained to her on Tuesday night about inhaling the ClO2 gas.  Next, the record shows the nursing notes from Willies admission to the hospital reflect Willie stated ClO2  bleaching agent  was released into air last [Thursday] and Willie went [through] area 3 times in 10 [minutes].  Further, consulting physician, Dr. Phillips, documented Willie informed him that approximately a week or so ago he was exposed to a chemical spill at the plant.  He describes this being a chloride-based bleach spill.  Finally, consulting physician, Dr. Felzien, also noted, The patient was initially involved in a chemical spill felt to be some type of chloride-based chemical approximately one week prior to admission.  
When evidence is erroneously excluded by the trial court, the appellate court first considers, among other things, whether the error may be deemed harmless because equivalent or cumulative evidence or testimony was offered.  Fields v. Regl Med. Ctr. Orangeburg, 363 S.C. 19, 31, 609 S.E.2d 506, 512 (2005).  The court also considers whether the aggrieved party managed to accomplish her primary objective, such as eliciting testimony about an issue or effectively cross-examining a witness.  Id. at 31-32, 609 S.E.2d at 512.  Additionally, the court considers whether, viewing the case as a whole, the excluded evidence or testimony was so crucial and important in proving the aggrieved partys claim or defense that its exclusion constitutes prejudicial error.  Id.  at 32-33, 609 S.E.2d at 513.  Considering the evidence of record that Willie complained to his wife and to medical personnel of his exposure to ClO2, the statement by Willie to Davis that he had been gassed was cumulative to the other evidence submitted on exposure to the chemical.  Further, Carolyn accomplished her primary objective of showing that Willie had complained of ClO2 exposure.  Finally, viewing the evidence as a whole, we are unpersuaded that this statement was so crucial to Carolyns claim that its exclusion constitutes reversible error.  The statement by Willie to Davis that he had been gassed added nothing to the other evidence on exposure.  In his deposition testimony, Davis stated Willie did not give him any further information beyond the statement that he was gassed.  Davis further testified in his deposition that, we all at one time or another have gotten gassed and some is worse than others.  This statement in no way elucidates the severity of the exposure.  Accordingly, we hold any error in the exclusion of this statement would be harmless and Carolyn suffered no prejudice by its exclusion.  
II.      Exclusion of opinion of pathologist
Carolyn next argues the exclusion of the opinion of Dr. Harley, who prepared the final autopsy in this case, was an abuse of discretion and based on an error of law.2  She asserts his opinion was excluded from consideration because it was allegedly based on a flawed hypothetical, and because Dr. Harleys report was not based on a hypothetical but was based on the actual record in this case, his opinion should not have been disallowed.
In his findings of fact, the Single Commissioner found Willie was not exposed to any significant concentration of ClO2 at the time in question.  The Commissioner concluded Dr. Harleys opinion regarding causation necessarily assumed Willie was exposed to ClO2 and this assumption was not supported by the greater weight of the evidence.  Accordingly, the Commissioner determined Dr. Harleys opinion regarding causation had little probative value and it was given little weight.  
First, it is clear the Commissioner did not exclude Dr. Harleys opinion from evidence.  Rather, the Commissioner determined Dr. Harleys opinion should be afforded little weight as Dr. Harley relied on the assumption Willie was in fact exposed to ClO2 on the date in question.  
We also note, reading the Commissioners decision as a whole, it is clear the Commissioner found Carolyn failed to prove Willie was exposed to ClO2 as alleged on the date in question, and that if he was in fact exposed, any exposure was fleeting and Willie was not exposed to any significant concentration of ClO2.  There is evidence of record that Willie failed to report any exposure to his employer at the time of the alleged incident and failed to report any exposure to the plant nurse a few days later when he went to first aid to complain of illness, in spite of the fact that Willie was a conscientious employee who knew protocol dictated he report an exposure.  Further, International Paper submitted evidence that Willie would not have been performing any major repairs on a mechanical problem, but was responsible only for reporting any such problems, and Willie specifically would not have been performing any repairs on a leak on the C line just prior to his coughing incident.  More importantly, Carolyn presented no evidence Willie caught a pretty good dose of ClO2 while repairing a pump on the C line, as she maintained before the Commission.  
Neither this court nor the circuit court can substitute its judgment for that of the Commission as to the weight of the evidence on questions of fact.  Further, the Full Commission adopted and incorporated the findings of the Single Commissioner.  The final determination of witness credibility and the weight to be accorded evidence is specifically reserved to the Full Commission.  Considering the record as a whole, we find there is substantial evidence that would allow reasonable minds to reach the conclusion the Full Commission reached on the issue of Willies exposure.  Even if the evidence were undisputed that Willie was in fact exposed to ClO2 on the date in question, there is substantial evidence of record that any exposure was minimal or fleeting, as Willie did not report the exposure to his employer at the time of exposure and also failed to report the exposure to the plant nurse several days later when complaining of illness.  
III.    Error of law in certain findings below 
Carolyn next asserts error in findings below that there was (a) no evidence of chemical exposure, (b) reports of that exposure or (c) complaints about it.  She argues, based on the record, these findings were an error of law.  We disagree.
We first note that Carolyn points to the following findings:

There is no competent evidence that [Willie] was exposed to ClO2, that he reported any exposure to ClO2, or that he complained of any work-related injury on or about August 19, 2000.  In fact, the substantial medical evidence in the record suggests [Willies] death was not related to any alleged exposure to ClO2.

The findings of which Carolyn complains are findings made by the circuit court, not the Commission.  In an appeal from the South Carolina Workers Compensation Commission, this court reviews the decision of the Commission to determine whether the claimants substantial rights have been prejudiced because the decision is affected by an error of law or is clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record.  Thus, the findings of the circuit court do not impact whether there is substantial evidence to support the Commissions decision.  The Commission found that the assumption Willie was exposed to ClO2 was not supported by the greater weight of the evidence, that Willie was not exposed to any significant concentration of ClO2 as asserted by Carolyn and, if he was in fact exposed, any exposure was fleeting.  These findings are supported by substantial evidence in the record.  
At any rate, considering the record as a whole, there is substantial evidence to support the findings of which Carolyn complains.  The record contains evidence that, had Willie been exposed as asserted by Carolyn, he was a conscientious employee who would have reported the exposure, and such exposure would have been well documented.  Thus, considering the record as a whole, there is evidence from which reasonable minds could have reached this conclusion.  Further, there is evidence of record that Willie did not report any exposure or complain of any exposure to his employer on the date in question, and these findings are likewise supported by substantial evidence.
IV.    Decisions below contrary to substantial, reliable, probative evidence
Lastly, Carolyn argues, because of specific erroneous findings, the findings of the Commission are not supported by substantial evidence.  We disagree.  
Carolyn asserts error in the Commissions finding that Willie had not mentioned anything about any alleged exposure to ClO2 to his wife and did not complain of any unusual symptoms until Tuesday night, August 22, 2000.  Carolyn testified before the Commission that she first became aware Willie was having problems with his health on Sunday, when [h]e was coughing and he was aching all over.  However, she acknowledged she had stated in her deposition that the first time Willie complained to her was on Tuesday night, August 22, clarifying that was the first time Willie complained about inhaling the ClO2 gas.  Accordingly, there is substantial evidence of record to support this finding.
Carolyn next complains of the Commissions finding that while Davis testified he saw Willie coughing on the day in question, he always coughed a little.  She asserts this finding trivializes Davis observation that he observed Willie coughing hard on the day in question.  The Full Commission is the ultimate fact finder and the weight to be accorded evidence is reserved to the Full Commission.  Shealy v. Aiken County, 341 S.C. 448, 455, 535 S.E.2d 438, 442 (2000).  The record shows, when asked whether he had ever seen him cough before in all the years he had known him, Davis testified Willie always coughed a little.  Thus, this finding is supported by substantial evidence of record.  Further, the Commission noted in its order that Davis also denied Willie coughed frequently or had shortness of breath.  Accordingly, the findings of the Commissioner do not support Carolyns argument that the Commissioner trivialized the evidence concerning Davis observation of Willie coughing on the date in question.
Carolyn also asserts the Commissions finding that Willies job involved reporting problems, but not fixing them, is contrary to the reliable, probative, and substantial evidence of the record as a whole.  We disagree.  Carolyn is apparently referring to the Commissions findings that Smith testified [Willie] did not ever do any major repairs because [Willie] was a production worker and repairs were not part of his job function, and that [a]pparently, [Willie] had no duties in connection with the in-line mixers on the C line.  Carolyn points to testimony from Smith that, when asked if Willie would perform minor repairs, he stated, If theres something like a packing on a valve or something like that they do have a (sic) pliers where they can like pull up on a packing.  However, the evidence of record supports both of the findings by the Commission.  First, Smith did testify that in Willies capacity as a Service Operator I, he never performed any major repairs, as it was not part of his job function.  Further, when discussing the in-line mixer on the C Line, Smith was asked if it was correct that if a problem were reported on the mixer, a mechanic would have performed all of the repair work.  Smith stated, Right, and the repair work for a mixer leak would be to change out the mixer.  And not to go do something, you know, to temporarily fix it.  Its just not a temporary fix.  Additionally, Davis testified that if there were any problems on the jobs they checked, they normally would not fix anything, but would just report the problem, and stated Willie would not have been performing any repairs on a leak on the C Line when he was called away.  Accordingly, considering the record as a whole, there is substantial evidence supporting the Commissions findings.
Carolyn next argues the Commissions finding that no chemical exposure occurred since there was no particular incident report in the file detailing a chemical exposure was improper.  She contends the absence of a company-generated report is entirely neutral and therefore neither supports nor refutes an inference that a chemical exposure occurred.  We disagree.  The record contains evidence that Willie failed to report any exposure to either his employer at the time of the alleged exposure or to the plant nurse days after the alleged exposure when he sought treatment for his illness.  Further, there is evidence of record that Willie was a conscientious employee who would have reported an exposure to a chemical.  The weight to be attributed to this evidence in determining whether Willie was exposed to ClO2 as claimed by Carolyn is reserved for the Commission and we will not substitute our judgment for that of the Commission as to the weight of the evidence on questions of fact.
Carolyn next contends the Commission erroneously found an employee, Mr. Lance, performed regularly scheduled maintenance on the C Line mixer on August 25, 2000 and found no problems with the valves and he did not have to perform or schedule any repairs because everything worked.  She argues this finding distorts reality by suggesting there could not have been any ClO2 leaks from the C Line mixer on August 18, 2000, when there was evidence the mixer had been replaced on August 24, 2000.  We first note the Commissions order in this respect appears to merely summarize the testimony of employee John Lance, and therefrom finds, Mr. Lances testimony does not support the Claimants allegations that [Willie] was exposed to ClO2 on August 19, 2000 or at any other time.  It does not find there could not have been a ClO2 leak from the C Line on August 18, 2000.  At any rate, Carolyn failed to include any testimony from Mr. Lance in the record on appeal.  Therefore this court has no way of reviewing the matter to determine whether there was any error in the Commissions order with respect to Mr. Lances testimony.  See Crestwood Golf Club, Inc. v. Potter, 328 S.C. 201, 215, 493 S.E.2d 826, 834 (1997)  (noting the appealing party has the burden of providing a sufficient record to allow consideration of an issue).
Finally, Carolyn contends the Commission erroneously relied on the opinions of International Papers medical experts in finding that Willies death was the result of his compromised pulmonary status.  She argues the fact that Willies pulmonary condition was compromised did not necessarily lead to the conclusion that his death was not compensable, and that the opinions of the companys medical experts should have been discounted because they erroneously relied on a flawed hypothetical that assumed Willie had not inhaled any ClO2 at all.  We disagree.
In order to be entitled to compensation for an injury under the South Carolina Workers Compensation Act, a claimant must show he suffered an injury by accident arising out of and in the course of the employment.  S.C. Code Ann. § 42-1-160 (Supp. 2004).  The term arising out of refers to the origin of the cause of the accident.  Harrell v. Pineland Plantation, Ltd., 337 S.C. 313, 323, 523 S.E.2d 766, 771 (1999).  An accidental injury is considered to arise out of ones employment when there is a causal connection between the conditions under which the work is required to be performed and the resulting injury.  Id. at 324, 523 S.E.2d at 771.
First, we have already found there is substantial evidence that would allow reasonable minds to reach the conclusion the Commission reached that Carolyn failed to prove Willie was exposed to ClO2 as alleged.  There is also substantial evidence of record that, even if the evidence were undisputed that Willie was in fact exposed to ClO2 on the date in question, any exposure was minimal or fleeting.  At any rate, a review of the record fails to show these doctors simply assume[d] that [Willie] had not inhaled any ClO2 at all as asserted by Carolyn.  To the contrary, these doctors all agreed that it was unlikely Willies death was related to the alleged chemical exposure, and clearly took into account Willies possible exposure to ClO2.  
For the foregoing reasons, the decision of the circuit court is
AFFIRMED.
ANDERSON, HUFF, and WILLIAMS, JJ., concur.

1 We decide this case without oral argument pursuant to Rule 215, SCACR.
2 Carolyn refers to Dr. Harleys report as the final autopsy.  The record shows Dr. Proctor performed an autopsy on Willie on August 31, 2000, and that Dr. Harley subsequently prepared an autopsy report after receiving certain body tissue from Dr. Proctor and apparently reviewing Dr. Proctors report.