698 S.E.2d 785

**In the Matter of Samuel Francis CREWS, III, Respondent.**

**No. 26870.**

Supreme Court of South Carolina.

Heard Nov. 3, 2009.
Decided Aug. 16, 2010.
Rehearing Denied Sept. 23, 2010.

---

324

Lesley M. Coggiola, of Columbia, for Office of Disciplinary Counsel.

Joshua Snow Kendrick, of Columbia, for Respondent.

PER CURIAM.

Following an investigation and hearing, a Hearing Panel of the Commission on Lawyer Conduct (Panel) found that Samuel Crews (Respondent) committed numerous acts of misconduct and recommended that Respondent be disbarred, ordered to pay costs of the proceedings, and ordered to pay restitution to clients and the Lawyers' Fund for Client Protection. Respondent now challenges the Panel's recommendation. As recommended by the Panel; we disbar Respondent, order him to pay restitution, and order him to pay the costs of the proceedings.

## FACTS

The charges in this matter stem primarily from the complaints of two former clients. With respect to these matters, Respondent misappropriated client funds, put clients' personal property to his own use, and engaged in various self-dealing transactions with regard to clients' real estate.

### I. Client A

Respondent was referred to Client A by friends who were concerned about his state of health. Client A wished to

execute a power of attorney (POA) so as to allow Respondent to handle his affairs while Client A was being treated for medical problems. At the time, assets owned by Client A or his father's estate [1] included a residence on Oceola Street (Oceola Street) in Columbia, three Certificates of Deposit, and various personal property.

## (1) Oceola Street

In July 2001, Respondent filed an Inventory and Appraisement of the Probate Estate of Client A's father, which listed the appraised value of Oceola Street as $80,000. Client A inherited the property and, in February 2002, Respondent signed a Contract for Sale on Client A's behalf, with Client A as seller and MDR Properties, Inc. (MDR) as the buyer. Michael Reynolds, Respondent's office manager, was the president and sole owner of MDR. Client A testified that he was not informed that the property was being sold to Respondent's office manager.

The Contract set the purchase price at $68,000 to include a $500 deposit, a certified check payable at closing for $33,500, and a second mortgage in the amount of $34,000 payable over fifteen years. In May 2002, Respondent used his power of attorney to sign a deed transferring the property from Client A to MDR. Respondent recorded the deed that same month.

Six months later, on November 7, 2002, Respondent's office manager, Michael Reynolds, resold the Oceola Street property for $92,000 on behalf of his corporations. From the proceeds of the sale, $68,000 was deposited that same day into Respondent's trust account for the benefit of Client A. Also on November 7, Respondent paid himself $7,500 in attorney's fees and $8,273.12 in "expenses" from the trust account, leaving $52,226.88 from the sale in the trust account for the benefit of Client A. That same day, MDR paid $15,000 to Main Properties, LLC (Main Properties), which is owned by Respondent. The following day, Respondent paid $15,000 to himself from the Main Properties account. None of these transactions were made known to or approved by Client A.

---

1. Client A's father died around the time he contacted Respondent. Client A stood to inherit under the will.

## (2) Chateau de Ville Property

Again using his power of attorney, Respondent entered into a contract to purchase a condominium in Chateau de Ville in Columbia on behalf of Client A for $67,500. At the time, Respondent represented both Client A and the seller, an Estate. There is no evidence that either Client A or the heirs of the Estate were advised of the conflict.

In connection with the sale, $4,725 was paid to Sunvest Properties, Inc., as a real estate commission, and Sunvest then issued a check for $3,375 to Reynolds as his commission for the sale. Reynolds's commission was based on an exclusive right to sell contract signed on the same day that the contract to purchase was signed. The right to sell contract provided for a commission of seven percent.

In May 2002, Respondent signed a deed on the Chateau de Ville property on behalf of Client A, conveying the property from Client A to Main Properties. The deed specified consideration as $69,000. Respondent signed a note on behalf of Main Properties promising to pay Client A $69,000 plus interest.[2] Client A testified that he never received any such payment. After the sale, Respondent rented the property and collected at least $16,000 in rent. He deposited $3,000 of rent into his trust account for the benefit of Client A and $13,000 into the checking account for Main Properties. Also after the sale, Respondent paid $3,189.10 from the trust account funds for Chateau de Ville regime fees.

Respondent paid $11,500 from trust account funds to Carolina Trucking, which performed demolition work for Respondent on several properties. The reference on the payment is "Portion of Chateau ..." The owner of Carolina Trucking testified that he did not recall doing work at Chateau de Ville for Respondent, but Client A had no interest in any of the properties listed on the receipt.

### (3) Accounting

After Client A filed a grievance with the Commission on Lawyer Conduct, Respondent was asked on a number of

---

2. Just over two months later, Respondent represented in documents submitted while applying for a loan that he owned the Chateau de Ville property but owed no money on it.

occasions to provide an accounting. In January 2004, Respondent was served with a subpoena requiring him to produce the accounting ledger for Client A no later than February 9, 2004. Respondent provided a client ledger for funds passing through the trust account on behalf of Client A and accounting journals for money market and checking accounts.

Client A's new attorney also requested a final accounting in January 2004. In December 2004, Respondent presented Client A with an affidavit for his signature which provided that Client A had been given a complete accounting on many occasions. Client A testified that Respondent brought the document by his home in the evening and read the document to him, though he would not allow Client A to read it. Nonetheless, Client A signed the affidavit. The following day, Respondent filed an accounting with the Probate Court. Client A was given an opportunity to review the accounting and indicated that he was satisfied with the accounting.

## II. Client B

In January 2002, Respondent was retained by Client B to probate the estate of his deceased wife. Client B agreed to pay Respondent $175 per hour and $75 per hour for paralegal work. In February 2002, Respondent drafted a durable power of attorney naming himself as attorney-in-fact for Client B. The document included a provision empowering Respondent to deal with himself in his own individual capacity "in buying and selling of assets, in lending and borrowing money, and in all other transactions, irrespective of the occupancy of the same person of dual positions[.]" ODC alleges that Respondent used his authority as attorney-in-fact to put Client B's funds and property to Respondent's own personal use.

### (1) H & R Block Account

In March 2003, Respondent, acting under the power of attorney, withdrew $330,431.49 from Client B's investment account at H & R Block. Respondent deposited the full amount into his trust account. Respondent explained to ODC that the funds were reinvested at Client B's request and direction. However, Respondent instead withdrew the funds and put them to his own personal use. Trust account records show payments from the trust account to the Crews Law

Firm, Main Properties, and Respondent. Respondent also used trust account funds to satisfy various personal obligations.

## (2) EverHome Mortgage Equity Line of Credit

In February 2004, Respondent used his power of attorney to obtain a line of credit at EverHome Mortgage Company for $100,000, secured by Client B's residence in Georgia. In the following months, Respondent deposited three checks totaling $92,500 from the equity line into the trust account and then issued checks from the trust account for his own benefit. Respondent explained that he obtained the funds with the consent of Client B for the purpose of qualifying Client B for a tax deduction, yet produced no evidence showing such consent.

## (3) Hummingbird Drive

In January 2002, in connection with the probate of the estate of Client B's deceased wife, Respondent filed an Inventory and Appraisement of the residence on Hummingbird Drive in Lexington, South Carolina. The document listed the appraised value of the property as $182,000. Almost two months later, in March 2002, Client B signed a contract of sale for the Hummingbird Drive property, listing the purchase price as $65,000.[3] In May 2002, the parties signed a deed conveying the property from Client B to Main Properties for consideration of $62,000. In September 2002, Respondent filed an Amended Inventory and Appraisement with the Probate Court listing the appraised value of the Hummingbird Drive property as $65,000. Respondent admitted that he did not have an appraisal done prior to entering into the contract of sale.

---

**3.** Barbara Seymour testified at the hearing that ODC received one version of the contract for sale in the first set of documents sent by Crews's attorney. After ODC asked for any conflict waivers or disclosures, it received the second version of the contract for sale, which included the following language: "The Escrow Agent hereinabove referred to shall be **Crews Law Firm. Seller is aware Sam Crews owns Main Properties, LLC and approves this sale.**" (emphasis in original). The signature page appears to be the same on both documents. Respondent testified that he did not know if the page containing the conflict waiver was ever presented to Client B. Aside from this document, no evidence was presented to show that Client B consented to the conflict.

Additionally, Respondent admitted that the terms of payment set forth in the contract of sale were not complied with. The contract provided that Main Properties was to pay $500 earnest money in the transaction, which would be held by the purchaser. The document also provided that Main Properties would pay $15,000 in cash or certified check at the closing. Respondent admitted that this payment was not made. Finally, the contract of sale provides that Main Properties would pay $49,500 on a note and mortgage. Respondent admitted that no such note or mortgage was prepared. Respondent asserted that "payments were made to [Client B]" but could provide no way to identify such payments.

Respondent used $4,285.16, which was held in trust for the benefit of Client B, to pay for repairs and upkeep of the Hummingbird Drive property during the time that the property was owned by Main Properties. During this same time period, Main Properties rented the property and collected $5,173.96 in income. In June 2004, Main Properties sold the Hummingbird Drive property for $122,000 and Main Properties left the closing with $103,561.59.

### (4) Mallard Apartments

Included in the estate of Client B's wife was an apartment complex on Howell Avenue in Columbia, which Respondent listed in a January 2002 Inventory and Appraisement at $560,000. Respondent and his office manager, Michael Reynolds, filed Articles of Incorporation establishing Mallard Apartments, LLC in February 2002. In March 2002, Thomas Watts & Associates completed an appraisal report for Palmetto State Bank in which it appraised the property at $840,000.

In May 2002, Client B signed a contract of sale for the apartments as the personal representative of his wife's estate. Reynolds signed on behalf of the purchaser, MDR. The purchase price was originally listed as $650,000, but was at some point reduced to $525,000. A third version of the contract, marked "revised contract" set the purchase price at $450,000 and listed the purchaser as Mallard Apartments, LLC.

Respondent obtained a $277,000 loan with which to purchase the property on which Client B signed a personal guaranty.

Before advancing the funds, the bank required Respondent to pay an existing personal loan of $25,105. Respondent paid the personal loan off with funds from the new loan.

Of the funds remaining after payment of Respondent's personal loan, $102,000 was placed in the Crews Law Firm Trust Account on behalf of Client B, Respondent received $100,000 in legal fees, and $2,055 was paid to directly to Client B. The HUD–1 form filed for the sale listed settlement charges to the Seller of $39,442.50 and $102,000 paid to Seller. The form listed the amount of the $450,000 purchase price not covered by the loan and "settlement charges," approximately $308,000, as paid as "legal fee to Crews Law firm for Estate and other matters." Respondent later admitted signing a note to Client B in the amount of $300,000 representing the unpaid amount from the Mallard Apartments transaction. Respondent testified that he made "some payments" to Client B for the purchase of Mallard Apartments but did not know how much. In 2004, Respondent made three payments of $6,218 each to Client B from the trust account, which the Panel designated as payments for Mallard Apartments.

Respondent filed an amended inventory and appraisement with the Probate Court in September 2002. The following year, though Client B no longer owned the property, Respondent used $8,604.41 of Client B's funds from the trust account to pay property taxes on the Mallard Apartments property.

### (5) Promissory Notes

In addition to the $300,000 note referenced above, Respondent prepared and signed seven promissory notes payable to Client B for amounts totaling $99,935. The notes matched payments or loans Respondent made to himself, his law firm, or Main Properties from the Client B funds in Respondent's trust account.[4] Respondent testified that he repaid some of this amount, but did not know how much.

---

4. For example, in March 2003, Respondent signed a promissory note and personal guarantee for $35,000. He then issued a check to himself for $35,000 from the trust account and deposited it in the Main Properties account.

## (6) Credit Card

Beginning in February 2003 and continuing through February 2004, Respondent was in possession of a Mastercard belonging to Client B. This was the same time period in which Client B was in the hospital and an assisted living facility. Though he had nothing in writing, Respondent explained that Client B told him to use the credit card "any way [Respondent] wanted to." Respondent admitted using the card to benefit Client B but also admitted using the card for his own personal uses. Respondent also admitted to allowing employees at his office use of the card, though he contended that such use was authorized only while transporting Client B. In all, Respondent charged over $19,000 to the card for personal and office expenses.[5] Respondent kept no written record of the purchases and paid the credit card bills with funds held in trust for Client B.

## (7) Will

Respondent prepared and presented a will to Client B in which Respondent was named as a primary beneficiary and residual beneficiary. The will named Respondent as Personal Representative with Reynolds as substitute Personal Representative.

## (8) Other

While Client B was hospitalized or living in an assisted living facility, Respondent removed items of personal property from a residence in Baxley, Georgia and from Hummingbird Drive. Respondent admitted putting some of these items to personal use.

Respondent also purchased a new 2002 Cadillac Escalade for $47,000. Though he paid the purchase price with proceeds from Client B's H&R Block investment account, the vehicle was titled in the name of Mallard Apartments, LLC. Respondent and his staff used the vehicle to transport Client B to various places at his request, but also made personal use of

---

5. Charges to the card included office supplies, criminal background checks associated with other client matters, clothing for Respondent and his family, pool supplies, dog supplies, repairs to his personal vehicles, garden supplies for Respondent's wife, meals, groceries, a camera, gun supplies, dental care, and a haircut.

the Cadillac. Respondent later had the title and registration of the vehicle transferred to his own name and eventually transferred title to Client B, though using Respondent's office address. Respondent paid the taxes and fees on the vehicle using funds held in his trust account for Client B and paid for gas and maintenance using Client B's credit card.

Respondent also paid $550 per month and a total of $3,300 from Client B's funds to Main Properties as rent for property on Wilmot Avenue. During this time, Client B was a resident of an assisted living facility.

Respondent wrote a number of checks from the trust account to R. Sims Tompkins, DMD and Jay Longnecker. Tompkins verified that Client B is not a patient of his and Respondent's firm employed a Jay D. Longnecker.

### (9) Legal Fees

Respondent provided ODC with legal fee invoices to Client B totaling $45,127. Respondent's records show that he received from Client B or paid himself from trust account funds $273,750 in legal fees.

### III. Client C

In an additional matter, Respondent failed to diligently pursue Client C's probate matter, to properly supervise an associate to whom he had assigned the case, and to adequately communicate with Client C. Client C was not available to testify at the hearing and the Panel declined ODC's request to leave the record open to allow her deposition to be taken at a later date.

### IV. Panel Findings

The Panel found numerous violations of the Rules of Professional Conduct (RPC) and recommended that Respondent be disbarred, ordered to pay costs, and ordered to pay restitution. Based on the above, the Panel found the following violations: Rule 1.7, RPC, Rule 407, SCACR, (conflict of interest with current client); Rule 1.8(a), RPC, Rule 407, SCACR, (lawyer shall not enter into a business transaction with client); 1.5, RPC, Rule 407, SCACR, (lawyer shall not collect an unreasonable fee); Rule 1.15, RPC, Rule 407, SCACR, (safekeeping of client property); Rule 8.4(b), RPC,

Rule 407, SCACR, (misconduct for lawyer to commit criminal act reflecting adversely on lawyer's honesty); Rule 8.4(d), Rule 407, SCACR, (misconduct for lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); Rule 8.1, RPC, Rule 407, SCACR, (lawyer in connection with disciplinary matter shall not knowingly make false statement of material fact; fail to cooperate with investigation); Rule 1.8(c), RPC, Rule 407, SCACR, (lawyer shall not solicit any substantial gift from client, including a testamentary gift); and Rule 417, SCACR, Rules for Lawyer Disciplinary Enforcement (RLDE) (financial recordkeeping).

## STANDARD OF REVIEW

The findings of the Panel are entitled to great weight; however, this Court may make its own findings of fact and conclusions of law and is not bound by the Panel's recommendation. *In re Larkin,* 336 S.C. 366, 371, 520 S.E.2d 804, 806 (1999). This Court has the ultimate authority to discipline attorneys and the manner in which the discipline is given rests entirely with this Court. *In re Long,* 346 S.C. 110, 112, 551 S.E.2d 586, 587 (2001).

## DISCUSSION

On review, Respondent raises a number of procedural arguments and contends that the Panel erred in finding there was clear and convincing evidence of such misconduct that disbarment was warranted. We disagree.

### I. Panel's consideration of ODC's proposed report.

Respondent argues that the Panel erred in considering the proposed report submitted by ODC because it was untimely. We disagree.

At the close of the hearing, Respondent's counsel and ODC counsel proposed waiving closing arguments and submitting proposed reports within thirty days of receipt of the transcript of the proceedings, to which the Chairman agreed. The transcript was filed with the Commission on January 5, 2009 and ODC's proposed panel report was filed with the Commission on April 9, 2009—outside of the 30–day window. Nevertheless, the Panel adopted ODC's proposed report. Respon-

dent contends that this Court is required to strike the Panel Recommendation due to ODC's untimely submission and to adopt Respondent's proposed report as it was the only timely submission. Respondent cites no authority for the remedy he proposes.

Rule 14(b)(1), RLDE, Rule 413, SCACR, provides the chair of the Commission broad powers to extend or shorten time periods in disciplinary hearings. We find that whether to accept the proposed report was within the Panel's discretion and the Panel did not abuse that discretion here.

## II. Testimony of Barbara Seymour

Respondent argues that the admission of Barbara Seymour's testimony before the Panel hearing was erroneous. We disagree.

### (1) No error in allowing testimony

■ Seymour acted as an investigator and prosecuting attorney in the time leading up to the hearing. When ODC called Seymour to testify, Respondent objected based on Rule 3.7, RPC, Rule 407, SCACR. Rule 3.7 prohibits a lawyer from acting as an advocate at a trial in which the lawyer is likely to be a necessary witness unless certain exceptions are met.

In our view, a respondent at an investigative hearing may not ask the Panel to adjudicate an opposing attorney's compliance with the Rules of Ethics. An independent grievance filing may be made, but the Panel is not the correct forum. In any event, we find no abuse of discretion on the part of the Chairman. Seymour was included on Respondent's witness list submitted prior to trial and her testimony at trial was limited to presentation of facts, documents, and statements by Respondent obtained in the course of the investigation. Thus, we find no error in the admission of Seymour's testimony at the hearing.

### (2) No error in not allowing Respondent's counsel access to Seymour's investigative file.

■ Respondent argued that he was entitled to access to Seymour's investigative file once she was presented as a witness. We disagree.

Rule 25, RLDE, Rule 413, SCACR, provides for the exchange of certain basic information regarding witnesses and for the exchange of other material "only upon good cause shown to the chair of the hearing panel." Rule 25(b), RLDE, Rule 413, SCACR. Whether to order the exchange of further information was therefore within the discretion of the Chair. Given that Seymour's testimony was limited to presentation of facts, documents, and statements by Respondent obtained in the course of the investigation, and that she was not permitted to testify as to her observations, opinions, or conclusions, we find that the Chair did not abuse its discretion in finding no good cause for production of the investigative file.

### (3) No error in denying Respondent a continuance and right to depose Seymour.

Respondent argues he had a right to a continuance and to depose Seymour once she was presented as a witness. We disagree.

Rule 25(c), RLDE, Rule 413, SCACR, addresses depositions and provides that depositions "shall only be allowed if agreed upon by the disciplinary counsel and the respondent or if the chair of the hearing panel ... grants permission to do so based on a showing of good cause." Rule 25(c), RLDE, Rule 413, SCACR. The Chairman acted within his discretion in refusing to allow Respondent to depose Seymour.

### III.  Hearsay Documents

During Seymour's testimony, certain documents produced in the course of the investigation were admitted. Respondent argues that particular documents, each submitted to ODC by his counsel, were hearsay. We disagree.

Specifically, Respondent objected to the admission of the following: (1) a trust account ledger for the Client A account; (2) a statement for an account for Client A maintained outside of the trust account; (3) a statement for the Client A checking account; and (4) a list of outstanding balances owed to Client A's doctors. We find that the Panel did not err in refusing to bar the admission of the documents as hearsay. Respondent provided the documents in response to a subpoena requiring him to submit, among other things, an accounting ledger for Client A maintained in compliance with Rule 417 of the South

Carolina Appellate Court Rules. The exhibits in question are, therefore, presumably what Respondent represents as his own work and records. The work product of Respondent is not hearsay. *See* Rule 801(d)(2), SCRE, ("A statement is not hearsay if . . . (2) The statement is offered against a party and is (A) the party's own statement in either an individual or a representative capacity[.]"). Moreover, because Respondent prepared and submitted the documents, Respondent arguably asserted a belief in their validity. *See* Rule 801(d)(2), SCRE, ("A statement is not hearsay if . . . (2) The statement is offered against a party and is . . . (B) a statement of which the party has manifested an adoption or belief in its truth[.]").

For these reasons, we find that the Panel did not err in admitting the documents.

## IV. Evidence to Warrant Disbarment

■ Respondent contends that there is no clear and convincing evidence to warrant disbarment. We disagree.

Respondent notes that the burden of proof rests with ODC and contends that ODC failed to meet its burden. We find overwhelming evidence to warrant disbarment. ODC showed through the presentation of numerous documents that Respondent drafted agreements containing inherent conflicts, put client property to his own personal use, misappropriated funds, engaged in improper real estate transactions with clients, failed to maintain proper records of receipt and disbursements of client funds, and failed to maintain records of his handling of client real and personal property. This Court has disbarred attorneys for similar misconduct. *See, e.g., In the Matter of Cunningham,* 371 S.C. 503, 640 S.E.2d 461 (2007) (disbarment warranted for attorney who misappropriated $70,000.00 from estate while acting as personal representative and failed to maintain accounts); *In the Matter of Murphy,* 367 S.C. 338, 626 S.E.2d 333 (2006) (disbarment appropriate for attorney who misappropriated $65,000.00 from trust account).

## V. Restitution to Clients and Reimbursement to Lawyers' Fund

Respondent argues that the Panel erred in recommending restitution to Client A and Client B where both have resolved

malpractice actions against Respondent. Respondent also objects to the Panel's recommendation that he pay the Lawyers' Fund for Client Protection. We disagree with Respondent as to both arguments.

### (1) Res Judicata and Collateral Estoppel

The Panel recommended that Respondent be required to pay $127,137.97 to Client A and $1,221,769.80 to Client B. The Panel noted that Respondent should receive a credit towards restitution for the amount he paid to satisfy the civil judgment Client A obtained against him in his malpractice action.

Both Client A and Client B filed civil actions against Respondent asserting claims of legal malpractice, fraud, and conversion. A jury awarded Client A $40,215.56 on the legal malpractice claims. Following Client B's death, his estate elected not to pursue the claim and the case was dismissed. Respondent contends that the Panel is "barred by the principles of *res judicata* and collateral estoppel from awarding additional damages to the parties in this proceeding."

*Res judicata* is a rule that a final judgment rendered by a court of competent jurisdiction on the merits is conclusive as to the rights of the parties and, as to them, constitutes an absolute bar to a subsequent action. Black's Law Dictionary 1174 (5th ed. 1979). To establish *res judicata*, the following elements must be shown: (1) identities of the parties; (2) identity of the subject matter; and (3) adjudication of the issue in the former suit. *See Riedman Corp. v. Greenville Steel Structures, Inc.*, 308 S.C. 467, 469, 419 S.E.2d 217, 218 (1992). We note that Respondent proposes the use of the doctrine of *res judicata*, not to bar an action, but to bar certain damages. *Res judicata* is not the proper vehicle for the remedy Respondent seeks. Moreover, Respondent has failed to establish the requisite elements for *res judicata*. Specifically, Respondent has failed to establish similarity of the parties, as Client A and Client B are not parties to the instant case, and similarity of issues, as the instant action focuses on misconduct. *Matter of Babilis*, 951 P.2d 207, 217 (Utah 1997) ("Because enforcement of attorney discipline matters implicates public interests that transcends the personal

interests of [the clients], the Bar is not acting on behalf of [the clients] but is acting to enforce sanctions in its own right."). Consequently, *res judicata* does not apply to bar restitution in this matter.

Respondent also argues that restitution to Client A and Client B is barred by collateral estoppel. Collateral estoppel, or issue preclusion, prohibits a court from adjudicating an issue that was actually litigated and determined by a valid and final judgment in a prior suit. *See Zurcher v. Bilton,* 379 S.C. 132, 135, 666 S.E.2d 224, 226 (2008). As noted above, the issue in the instant case is Respondent's alleged misconduct, and restitution is a sanction that follows from a finding of misconduct. *See In re Ruffin,* 382 S.C. 598, 677 S.E.2d 25 (2009) ("We hold disbarment without retroaction, costs, and restitution are warranted sanctions."); *see also* Rule 7(b)(7), RLDE, Rule 413, SCACR, (recognizing restitution as a sanction for misconduct). The issue of alleged misconduct could not have been litigated in the legal malpractice action as "the duty of adjudging the professional conduct of members of the Bar and taking appropriate disciplinary action rests exclusively with this Court." *In re Ruffin,* 382 S.C. at 604, 677 S.E.2d at 28 (citing *In the Matter of Hines,* 275 S.C. 271, 273, 269 S.E.2d 766, 767 (1980)). Consequently, collateral estoppel does not apply to bar restitution in this matter.

We find that the amount of restitution recommended by the Panel to be made to Client A and Client B is appropriate. Respondent challenged the appropriateness of restitution, not the amount of restitution recommended by the Panel. Thus, finding no bar to ordering Respondent to make restitution, we adopt the recommendation of the Panel in so far as it concerns restitution to Client A and Client B.[6]

---

6. Even if Respondent had challenged the amount of restitution recommended by the Panel, we see nothing in the record to indicate he kept sufficient records to support such an argument. *See In the Matter of Miles,* 335 S.C. 242, 247, 516 S.E.2d 661, 663 (1999) ("When disciplinary counsel presents clear and convincing evidence of trust account violations or other inadequate recordkeeping a lawyer's records must be sufficiently detailed to overcome the allegations.").

## (2) **Restitution to the Lawyers' Fund**

In addition to restitution to Client A and Client B, the Panel Report recommended restitution should be made to the Lawyers' Fund for Client Protection (Lawyers' Fund) for funds paid from Respondent's trust accounts for commission on the sale of Chateau de Ville and funds paid to Client B for the sale of Mallard Apartments.

Respondent objects to the recommended restitution to the Lawyers' Fund because he claims he did not have knowledge of the payments or an opportunity for a hearing before payments were made. However, as noted by ODC, the Panel Report makes no finding that the Lawyers' Fund made payments to Client A and Client B. Instead, the Panel recommended that Respondent be ordered to deposit with the Lawyers' Fund an amount equal to the payments he made to Sunvest Properties as commission for the sale of Chateau de Ville and to Client B for the sale of Mallard Apartments. ODC notes that these payments were made from Crews's trust account from unidentified funds and "[s]ince this money has not been identified, it is appropriate to require Respondent to make an equivalent deposit with the Lawyers' Fund in the event claims are filed on behalf of the client or clients to whom it belongs."

Pursuant to Rule 7(b)(10), RLDE, this Court has broad powers to impose sanctions.[7] We find that, due to the severity of Respondent's misconduct and the possibility that a claim will be made against the Lawyers' Fund for the funds at issue, requiring him to pay restitution to the Lawyers' Fund in the amount recommended by the Panel is appropriate.

## CONCLUSION

This matter involved the aggravated misconduct of an attorney who engaged in egregious, predatory behavior, taking advantage of and causing great detriment to his clients. Re-

---

7. *See* Rule 7(b)(10), RLDE ("Misconduct shall be grounds for one or more of the following sanctions: ... (9) any other sanction or requirement as the Supreme Court may determine is appropriate").

spondent took vast, yet unchecked, power over the affairs of the clients at issue. Respondent used these powers for his benefit, but to the detriment of the clients. When a lawyer acquires fiduciary duties over his clients' affairs, as is the case in this matter, he must meticulously account for his handling of the client's real and personal property. Respondent failed to keep account of his handling of his clients' financial transactions, hiding the great detriment he caused them. Any friendship Respondent gave to the clients at issue here, as he claims to have provided them, is no substitute for the great harm he caused them.

For these reasons, we adopt the Panel's recommendation to disbar Respondent. Further, we order him to pay restitution in the following amounts: $86,922.41[8] to Client A, $1,221,769.80 to Client B, and $23,379.00 to the Lawyers' Fund for Client Protection. Finally, we order Respondent to pay the costs of the proceedings.

Within ninety (90) days of the date of this opinion, the Commission and Respondent shall enter into a restitution agreement which complies with the directives of this order. Further, within (30) days of the date of this opinion, Respondent is ordered to reimburse the Commission and the Office of Disciplinary Counsel for costs incurred in this matter.

**DISBARRED.**

PLEICONES, J. not participating.

---

8. The Panel recommended that Respondent be ordered to pay $127,137.97 in restitution to Client A, yet be credited the amount Client A received as a result of a civil suit against Respondent. The amount Client A received in the civil suit against Respondent was $40,215.56. The amount we order Respondent to pay Client A in restitution reflects this credit. Additionally, however, credited to the amount Respondent pays to Client A in restitution should be the amount, if any, the Lawyers' Fund may have paid to Client A with respect to this matter.