# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

In the Matter of Richard Guy Bush, Respondent.

Appellate Case No. 2023-001038

Opinion No. 28241
Submitted August 1, 2024 – Filed November 6, 2024

## DISBARRED

Disciplinary Counsel William M. Blitch, Jr., and Assistant Disciplinary Counsel Phylicia Yvette Christine Coleman, both of Columbia, for the Office of Disciplinary Counsel.

Barbara Marie Seymour, of Clawson & Staubes, LLC, of Columbia, for Respondent.

**PER CURIAM:**   In this attorney disciplinary matter, Respondent and the Office of Disciplinary Counsel (ODC) have entered into an Agreement for Discipline by Consent (Agreement) pursuant to Rule 21 of the Rules for Lawyer Disciplinary Enforcement (RLDE) contained in Rule 413 of the South Carolina Appellate Court Rules (SCACR).  In the Agreement, Respondent admits misconduct and consents to either a three-year definite suspension or disbarment.  We accept the Agreement and disbar Respondent from the practice of law in this state.  The facts, as set forth in the Agreement, are as follows.

**I.**

Respondent was born in 1973 and was admitted to practice in 2009.  Respondent has no prior disciplinary history.  The Agreement before the Court involves three disciplinary complaints.

*Matter A*

Respondent owned and operated a title insurance agency called Custodio Settlement Services, Inc. ("Custodio"). Client A hired Respondent and Custodio to handle a home loan refinance transaction. On November 30, 2020, Respondent received $334,000 from Sun Trust Bank to satisfy Client A's existing home loan. As of January 19, 2021, Respondent had not satisfied the prior mortgage, leaving Client A with two active mortgages on his home.

Respondent set aside Client A's file while awaiting all executed documents. In early January 2021, Respondent was made aware that Client A's file was still open; however, Respondent did not complete the wire transfer to finalize the closing until February 3, 2021. Respondent refunded the attorney's fees he received from Client A. Respondent admits he used funds from Client A's real estate closing to replace funds he misappropriated from another real estate closing.

Respondent admits he failed to act with reasonable diligence and promptness in representing client A; failed to safeguard money entrusted to him for Client A's closing; and misappropriated Client A's loan proceeds for his personal or business use in violation of the following provisions of the Rules of Professional Conduct, Rule 407, SCACR: Rule 1.3 (requiring diligence); Rule 1.15(a) (requiring a lawyer to appropriately safeguard client funds); Rule 1.15(d) (requiring a lawyer to promptly deliver funds to third parties); Rule 1.15(g) (prohibiting a lawyer from using client funds to benefit the lawyer or anyone other than the owner of the funds); Rule 8.4(a) (prohibiting a violation of the Rules of Professional Conduct); Rule 8.4(d) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation); and Rule 8.4(e) (prohibiting conduct prejudicial to the administration of justice).

*Matter B*

Respondent became an authorized issuing agent for Investors Title Insurance Company ("ITIC") on May 23, 2017. Respondent was authorized to countersign and deliver ITIC title insurance commitments, policies, and closing protection letters. ITIC suspended Respondent as an authorized agent on November 2, 2020, for failure to provide the required documents for review to consider his renewal as an agent. Upon his suspension, Respondent no longer had access to ITIC's computer-generated forms or computer system. Additionally, Respondent could not issue title insurance commitments or request the issuance of closing protection letters. Respondent's insurance agent license, which had been issued by the South

Carolina Department of Insurance, expired on February 28, 2021.

In connection with a refinance closing, Respondent and Custodio were contracted to provide title closing services to Client B.  On April 28, 2021, Respondent issued a title commitment letter, and on May 17, 2021, Respondent issued a closing protection letter; both letters were issued to Freedom Mortgage Corporation ("FMC") in connection with this refinance closing.  Respondent issued both letters under ITIC letterhead and on the appropriate trade association forms commonly used in the industry.  The title commitment letter identified Custodio as the issuing agent, and the closing protection letter identified the issuing agent as Custodio and Respondent.

On May 28, 2021, Respondent provided FMC's closing management firm with a certification that he was an authorized title agent for ITIC.  Respondent confirmed, on a recorded line, the wire transfer information for the mortgage proceeds to be sent to him for disbursement at the closing.  Respondent was subsequently terminated as an ITIC agent on June 10, 2021, retroactive to November 2, 2020, which was the date ITIC had previously suspended him as an agent.

On July 12, 2021, ITIC received a claim from FMC regarding a refinance mortgage loan transaction purportedly closed by Respondent on June 2, 2021.  The claim from FMC asserted the old mortgage, which was to be paid off by the loan proceeds from the new mortgage loan, had not been satisfied.  FMC funded the loan in the amount of $172,500 via wire to the bank account Respondent provided on the recorded line.

Respondent and Custodio received the wired funds but failed to disburse the loan proceeds to pay off the existing Fannie Mae mortgage in the amount of $164,351.55, as required by FMC's closing instructions.  FMC provided ITIC with a final closing disclosure, showing the collection of a premium for issuing an ITIC lender's title insurance policy and a fee for issuing the closing protection letter. Respondent collected a total of $1,987.80 in title insurance fees which he was not entitled to receive.

Because Respondent failed to disburse funds to FMC to pay off the clients' existing mortgage loan, FMC continued to bill the borrowers for payments which caused their credit scores to plummet.  Respondent caused a loss to FMC, estimated to be in excess of $185,000.  As part of a settlement agreement, Respondent agreed to

pay FMC the sum of $126,000.[1]

Respondent admits he used finds from Client B's closing to replace funds he misappropriated from Client A (previous matter above) and using funds from Client C to repay funds taken from Client B.[2] Respondent also admits he fraudulently represented himself and his title agency as an authorized agent for the real estate closing and that he fraudulently collected fees, costs, and premiums associated with the issuance of ITIC's lender's title insurance policy and closing protection letter. Additionally, Respondent admits he failed to safeguard fees entrusted to him for closings and instead misappropriated the loan proceeds for his personal or business use. Respondent admits his conduct in this matter violated the following provisions of the Rules of Professional Conduct, Rule 407, SCACR: Rule 1.1 (requiring competence); Rule 1.3 (requiring diligence); Rule 1.15(a) (requiring a lawyer to appropriately safeguard client funds); Rule 1.15(d) (requiring a lawyer to promptly deliver funds to third parties); Rule 1.15(g) (prohibiting a lawyer from using client funds to benefit the lawyer or anyone other than the owner of the funds); Rule 1.16(d) (requiring a lawyer, upon termination of representation, to surrender papers and property to which the client is entitled and refund any unearned fee or expense); Rule 4.1 (requiring truthfulness in statements to others); Rule 4.4 (requiring a lawyer to respect the rights of third persons); Rule 8.4(a) (prohibiting a violation of the Rules of Professional Conduct); Rule 8.4(d) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation); and Rule 8.4(e) (prohibiting conduct prejudicial to the administration of justice).

*Matter C*

On December 23, 2019, Respondent conducted a closing on a residential loan refinance transaction for Client D. Proceeds from the refinance loan in the amount of $242,310.97 were intended to pay off Client D's existing mortgage with Wells Fargo, and proceeds totaling $15,433.71 were intended to pay off a car loan with Bank of America. The loan proceeds were disbursed on December 30, 2019. Respondent used the proceeds to satisfy the car loan but failed to satisfy the prior mortgage. Client D began receiving statements from Wells Fargo in 2020 and

---

[1] On March 7, 2022, Respondent wired funds as an initial payment, and he subsequently executed a promissory note for the remaining $93,994.90 on April 20, 2022.

[2] After this transaction, Respondent did not conduct any additional real estate closings and failed to repay Client C.

contacted Respondent for assistance.

On March 3, 2020, Respondent informed Client D that he was going to contact Wells Fargo regarding the mortgage statements. Respondent requested Client D return the signature page of an engagement letter; however, he assured Client D that she would not be paying any additional costs. On April 6, 2020, Respondent contacted Client D to update her regarding the Wells Fargo matter. Respondent informed Client D that he was working with Wells Fargo to correct her account and that Wells Fargo had applied the monies to someone else's account. Respondent also informed Client D that a payment had been made on her behalf to keep her account current while the situation was being resolved.

On August 19, 2020, Respondent was placed on interim suspension. *In re Bush*, 434 S.C. 85, 862 S.E.2d 710 (2021). On August 31, 2020, Respondent informed Client D that he was going to sue Wells Fargo and obtain $20,000 in damages for her. Respondent did not inform Client D that he had been placed on interim suspension.

On February 16, 2022, Client D informed Respondent that she was still receiving statements from Wells Fargo. On March 20, 2022, Client D informed Respondent the Wells Fargo account was negatively affecting her credit score, interest rate, and the loan on her current home. In response, Respondent informed Client D, "I am going to plow back in to this and let me talk with some colleagues about a way to get a better resolution quickly."

On March 29, 2022, Client D received a letter from Wells Fargo regarding her payments and confirmation that her account was reported to credit bureaus because the January 1, 2020 payment was not received until February 28, 2020. Wells Fargo indicated to Client D that they needed more information regarding her inquiry about credit being applied to an incorrect account. Client D sent Respondent the letter from Wells Fargo. Respondent replied to Client D, "this is good information," and requested a phone call with her to discuss his plan for moving forward. On April 27, 2022, Client D requested an update from Respondent because she was trying to purchase a car and the interest rate was being affected by the delinquent Wells Fargo action on her credit report. On May 4, 2022, Respondent sent Client D a Specific Power of Attorney, stating Wells Fargo needed it in order to allow Respondent to handle her account. Client D expressed her confusion and told Respondent she did not understand why Wells Fargo needed a power of attorney when it was their mistake. Through further email exchanges, Client D expressed that she was not comfortable signing a power

of attorney.

Respondent never informed Client D that her existing mortgage had not been satisfied. Instead, Respondent provided false information to Client D regarding the status of the debt. From February 2020 to August 2023, Respondent made thirty (30) payments on Client D's loan, for a total of $102,149.50. As of September 2023, Wells Fargo stopped accepting payments from Respondent and pursued a foreclosure action against Client D on October 20, 2023.[3]

Respondent admits he failed to safeguard fees entrusted to him for the closing and, instead, misappropriated the loan proceeds for his personal or business use. Respondent admits his conduct in this matter violated the following provisions of the Rules of Professional Conduct, Rule 407, SCACR: Rule 1.1 (requiring competence); Rule 1.3 (requiring diligence); Rule 1.15(a) (requiring a lawyer to appropriately safeguard client funds); Rule 1.15(d) (requiring a lawyer to promptly deliver funds to third parties); Rule 1.15(g) (prohibiting a lawyer from using client funds to benefit the lawyer or anyone other than the owner of the funds); Rule 4.1 (requiring truthfulness in statements to others); Rule 8.4(a) (prohibiting a violation of the Rules of Professional Conduct); Rule 8.4(d) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation); and Rule 8.4(e) (prohibiting conduct prejudicial to the administration of justice).

## II.

Respondent admits his misconduct as set forth above is grounds for discipline under Rule 7(a)(1), RLDE, Rule 413, SCACR (providing a violation of the Rules of Professional Conduct is a ground for discipline).

In the Agreement, Respondent admits his wrongdoing, agrees to a three-year definite suspension or disbarment, requests that his sanction be imposed retroactively to the date of his interim suspension, and agrees to pay costs. Attached to the Agreement is an affidavit in mitigation in which Respondent explains that at the time of the misconduct, he was experiencing significant marital and personal stressors, which eventually led him to suffer with depression, abuse

---

[3] Two weeks later, Client D filed a complaint with ODC. On November 6, 2023, Client D filed a $257,840 claim with the Lawyers' Fund for Client Protection. On January 26, 2024, the Lawyers' Fund approved an award of $40,000 in favor of Client D, which is the maximum per-client award allowed under Rule 411(c)(1), SCACR.

alcohol, and fail to appropriately manage his law firm finances.  Respondent explains that he is now divorced and has a much healthier personal life.  Respondent also expresses remorse for his actions and avers that he has sold various properties to pay full restitution to his clients and others who suffered losses as a result of his misconduct.

## III.

Based on Respondent's pattern of misconduct, we find disbarment is the appropriate sanction.  *See In re Crews*, 389 S.C. 322, 698 S.E.2d 785 (2010) (disbarring an attorney who engaged in a pattern of dishonest real estate transactions through which he misappropriated client funds); *In re Ledford*, 328 S.C. 280, 494 S.E.2d 118 (1997) (disbarring an attorney who falsified documents in connection with a real estate transaction and misappropriated client funds).  Accordingly, we accept the Agreement and disbar Respondent from the practice of law in this state.[4]  Within fifteen days of the date of this opinion, Respondent shall surrender his Certificate of Admission to the Practice of Law to the Clerk of this Court.  Within thirty days, Respondent shall pay the costs incurred in the investigation and prosecution of this matter by ODC and the Commission on Lawyer Conduct.  Additionally, Respondent shall provide documentation to the Commission indicating restitution has been paid to all affected parties.

**DISBARRED.**

**KITTREDGE, C.J., FEW, JAMES, HILL and VERDIN, JJ., concur.**

---

[4] We decline to impose this sanction retroactively.